```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3
    UNITED STATES OF AMERICA,      ) CRIMINAL NO.
 4                                 ) 10-00384-LEK
          Plaintiff,               )
 5                                 ) Honolulu, Hawaii
          vs.                      ) August 27, 2013
 6                                 ) 9:05 a.m.
    ROGER CUSICK CHRISTIE,    (01) )
 7  SHERRYANNE L. CHRISTIE,   (02) ) Evidentiary Hearing
    formerly known as               ) Regarding Defendants
 8  "Sherryanne L. St. Cyr",       ) (01) and (02) Motion in
                                   ) Limine to Present a
 9             Defendants.         ) Religious Freedom
    _____) Restoration Act Defense
10

11                  TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE LESLIE E. KOBAYASHI
12               UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Government:      Michael K. Kawahara
                             Office of the United States Attorney
15                           Prince Kuhio Federal Building
                             300 Ala Moana Blvd Ste 6100
16                           Honolulu, HI 96850

17  For Defendant(01):       Thomas M. Otake
                             Thomas M. Otake AAL, ALC
18                           345 Queen Street, Ste 600
                             Honolulu, HI 96813
19
    For Defendant(02):       Lynn E. Panagakos
20                           841 Bishop St., Ste 2201
                             Honolulu, HI 96813
21

22  Official Court           Cynthia R. Ott, RMR, CRR
    Reporter:                United States District Court
23                           P.O. Box 50131
                             Honolulu, Hawaii 96850
24
    Proceedings recorded by machine shorthand, transcript produced
25  with computer-aided transcription (CAT).
```

```
 1                               INDEX
 2   EXAMINATION
 3   Witness Name                                        Page
 4   Jessica Walsh
 5           Direct By Mr. Kawahara.....................  8
 6           Cross By Mr. Otake......................... 13
 7           Cross By Ms. Panagakos.................... 37
 8           Redirect By Mr. Kawahara.................. 46
 9           Recross By Mr. Otake...................... 60
10           Recross By Ms. Panagakos.................. 62
11   Victoria Fiore
12           Cross By Mr. Otake........................ 65
13           Cross By Ms. Panagakos.................... 76
14   Edwin Buyten
15           Cross By Mr. Otake........................ 82
16           Cross By Ms. Panagakos.................... 90
17
18   EXHIBITS
19   Exhibit                                            Page
20   (Government's Exhibits from Exhibit List Filed 08/22/2013:)
21   Sze 1 - 4 Received in Evidence....................... 79
22   Sze 5 - 9 Received in Evidence....................... 80
23   Buyten 1 - 11 Received in Evidence................... 79
24   TT1 Transcripts Received in Evidence................. 79
25   TT2 Transcripts Received in Evidence................. 79
```

1   EXHIBITS (CONTINUED)

2   Exhibit                                                    Page

3   TT3 Transcripts Received in Evidence................... 79

4   Undercover Officer Recordings Received in Evidence..... 79

5   THC Ministry Web Site Excerpts Received in Evidence.... 79

6   SK-01 – SK-11 Received in Evidence..................... 79

7

8   Defendants Joint Exhibits A - O Received in Evidence... 79

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   TUESDAY, AUGUST 27, 2013                        9:05 A.M.
 2            THE CLERK:  Criminal 10-00384LEK, United States of
 3   America versus Defendant (01), Roger Cusick Christie, and
 4   Defendant (02), Sherryanne L. Christie, formerly known as
 5   Sherryanne L. St. Cyr.  This case has been called for an
 6   evidentiary hearing regarding Defendants 1 and 2's motion in
 7   limine to present a Religious Freedom Restoration Act defense.
 8            Counsel, please make your appearances for the record.
 9   Please speak into a microphone.
10            MR. KAWAHARA:  Good morning, Your Honor.  Michael
11   Kawahara representing the United States of America.
12            THE COURT:  Good morning, Mr. Kawahara.  Mr. Otake.
13            MR. OTAKE:  Good morning, Your Honor.  Thomas Otake on
14   behalf of Roger Christie, who is present.
15            THE DEFENDANT:  Good morning, Judge.
16            THE COURT:  All right.  The record will reflect his
17   presence.  Good morning.
18            MS. PANAGAKOS:  Good morning, Your Honor.  Lynn
19   Panagakos on behalf of Sherryanne Christie, who is present.
20            THE COURT:  Good morning.  The record will reflect the
21   presence of Mrs. Christie.  So, are we ready to proceed with
22   our hearing?
23            MR. OTAKE:  Yes.  Your Honor.
24            THE COURT:  Yes.
25            MR. OTAKE:  As a very first preliminary issue, Your
```

1   Honor, I understand the marshals are just doing their job and

2   it is policy, I guess there's a new policy about those in

3   custody being handcuffed unless it's a trial, but it would be

4   really helpful to me if he could take notes.  And obviously,

5   you know, he's been on his best behavior every time he's been

6   before you.  So I would ask the Court to order that he be taken

7   out of his handcuffs so that he can help in his defense.

8          THE COURT:  All right.  The Court will so order.

9          MR. OTAKE:  Thank you.

10          THE COURT:  All right.  Of course, Mr. Christie, you

11   understand the security issues, but the Court finds it

12   reasonable for him to have his hands free to assist Mr. Otake

13   and to take notes and otherwise communicate by writing.

14          MR. OTAKE:  Thank you.

15          THE COURT:  Are the parties in agreement that I should

16   impose the witness exclusionary rule or is that not necessary,

17   Mr. Kawahara?

18          MR. KAWAHARA:  Yes, Your Honor.  I think that would be

19   appropriate.

20          THE COURT:  All right.  Any objection by the defense?

21          MR. OTAKE:  No, Your Honor.

22          THE COURT:  Okay.  There being no objection, the Court

23   imposes the witness exclusionary rule.  So any witnesses other

24   than representative parties must be outside the courtroom when

25   any testimony is being taken.

1              For planning purposes, I just need to let you know

2      that if we're not finished by 1:30, I am going to take the

3      lunch break then.  And then we'll return after that because I

4      have to take my son to the doctor's, but other than that.

5              MR. KAWAHARA:  We're following your trial schedule, I

6      believe.

7              THE COURT:  Yes.  Yes.

8              MR. OTAKE:  I should have had a bigger breakfast.

9              THE COURT:  I'm sorry.  There's lots of candy up here.

10     Mr. Nakamura will share that with you.

11             All right.  So we're ready to proceed?

12             MR. KAWAHARA:  Yes, Your Honor.  I'm having the first

13     witness called to be brought into the courtroom.

14             THE COURT:  All right.  Very well.

15             MR. KAWAHARA:  The first witness, Your Honor, is

16     Jessica Walsh.  And if I may, Your Honor, I'd like to ask a

17     couple questions as part of my direct exam of her before

18     turning her over for cross-examination.

19             THE COURT:  All right.  So that's outside of your

20     declaration?

21             MR. KAWAHARA:  Yes.  Yes, it is, Your Honor.

22             THE COURT:  Do you have any -- okay.  Mr. Otake.

23             MR. OTAKE:  I mean, I guess that was not the

24     understanding of how we were proceeding today, but I mean if

25     it's just a few questions, I don't have a big problem with

 1    that.  If he's going to go on about a lot more things, then

 2    that should have been put in the declaration.

 3         MR. KAWAHARA:  Well, Your Honor, realize that there's

 4    been a lot of subsequent briefing, a lot of matters.  I tried

 5    to get the declaration in as quickly as possible early on to

 6    defense counsel, and if we were going the regular route --

 7         THE COURT:  Yes.

 8         MR. KAWAHARA:  -- I would be permitted to ask all of

 9    these questions during direct examination here.

10         MR. OTAKE:  Well --

11         THE COURT:  Okay.

12         MR. OTAKE:  -- and I'm not objecting.

13         THE COURT:  Okay.

14         MR. OTAKE:  I'm just curious of the scope of how far

15    he's going to be going so.

16         MR. KAWAHARA:  I don't think it's going to be more

17    than about five to 10 minutes, Your Honor.

18         MR. OTAKE:  That's fine.

19         THE COURT:  So no objection.  All right.  You may.

20         (Witness sworn.)

21         THE CLERK:  Please state your name and spell your last

22    name for the record.

23         THE WITNESS:  My name is Jessica R. Walsh.  My last

24    name is W-A-L-S-H.

25         MR. KAWAHARA:  And can we have a stipulation as to

```
 1    identity for both defendants, so we don't have to go through

 2    the in-court identification?

 3               MR. OTAKE:  That's fine.

 4               MS. PANAGAKOS:  Yep.

 5               MR. KAWAHARA:  Very well, Your Honor.

 6                         DIRECT EXAMINATION

 7    BY MR. KAWAHARA:

 8    Q    Ms. Walsh, I have a -- aside from your declaration that

 9    was previously filed, I have just a couple questions, if I may

10    ask of you.  If you could, first of all, look at the computer

11    screen in front of you.  Do you see that in front of you?

12    A    I do, yes.

13    Q    This is what has been marked as SK Exhibit 11.  And do you

14    recognize what's shown in this particular photograph?

15    A    I do, yes.

16    Q    What do you see there?

17    A    It's two ministry ID cards.

18    Q    And is that the two ministry cards, is that both the front

19    on one card and the back on the other card?

20    A    On my screen it's the front on the left and the back on

21    the right.

22    Q    So now in your declaration you've indicated that you

23    would -- among one of the jobs that you had at the ministry was

24    putting together the Sanctuary Kits; is that correct?

25    A    That is correct.
```

1   Q     And how many ministry ID membership cards did you include

2   in each Sanctuary Kit?

3   A     Two in each.

4   Q     Two?

5   A     Uh-huh.

6   Q     So the -- and so the person who received the Sanctuary Kit

7   had two cards to do with what they wanted to?

8   A     Yes.

9   Q     Now, if you look at the sanctuary card itself, you notice

10  that these are blank?

11  A     Yes.

12  Q     And when you sent out these Sanctuary Kits with these

13  membership cards, were all the membership cards all blank too?

14  A     They were blank, yes.

15  Q     And where is there on this, on this membership card where

16  the person's name was supposed to be filled in?

17  A     They would sign their name on the signature line on the

18  front of the card.

19  Q     I see.  And if I'm -- how do I do this, Warren, to mark

20  it?

21        Well, if you look at the front of the card, which is

22  on the right with the heart on it.

23        THE COURT:  I think you touch the screen and if you

24  circle it it'll -- yes, there you go.

25        MR. KAWAHARA:  Didn't do it the way I wanted, but I

 1    think everyone understands.

 2            THE COURT:  Or if you hold it, I think it'll highlight

 3    it.

 4            MR. KAWAHARA:  Undo is here, I think one or the other.

 5    BY MR. KAWAHARA:

 6    Q    But do you see where the signature block is on the front

 7    of the card, which is on the left of the screen?

 8    A    I do, yes.

 9    Q    And it says that's a signature there, right?

10    A    Yes.

11    Q    And so the person's supposed to sign their signature

12    there?

13    A    Their signature, yes.

14    Q    Now, when you -- did you also have the opportunity to hand

15    out membership cards for people who applied in person at the

16    ministry?

17    A    I did, yes.

18    Q    And when you handed them the cards or when you gave them

19    the cards, were they blank cards too?

20    A    They were blank cards.

21    Q    And who was supposed to fill out the signature on these

22    membership cards that you were handing out?

23    A    The prospective member filled out the signature.

24    Q    And let me also show you two other exhibits.

25            What I'm showing you now is marked as Sze, S-Z-E,

1    Exhibit 9.  Do you see that in the screen in front of you?

2    A    I do, yes.

3    Q    And do you see that membership card at the top?

4    A    Yes.

5    Q    Is there a name filled out there?

6    A    There is.

7    Q    And can you read that?

8    A    Reverend Richard Turpin.

9    Q    T-U-R-P-I-N?

10   A    Yes.

11   Q    And let me show you another exhibit.  What I'm showing you

12   is Exhibit Sze Exhibit 8.  Do you see that?

13   A    I see it, yes.

14   Q    And can you make out the signature there?

15   A    I cannot make out the signature.

16   Q    Now, when you were working at -- on Express.  Now you

17   describe Express in your declaration, when you were working on

18   Express, what did the individual have to do to identify

19   themselves to you?

20   A    They would have to show this, their ministry ID card.

21   Q    And what happens if like on this particular card you

22   couldn't make out their signature?  Was there any further

23   identification process which was required for you to do of

24   them?

25   A    There was not, no.

1    Q    What was all that they needed -- and if an individual came

2    to you for Express to obtain sacrament, what was all that they

3    needed to do to be eligible to receive sacrament?

4    A    They had to show their ministry ID card, but I wasn't -- I

5    didn't check the signature or read the signature or --

6    Q    Was there any requirement imposed on you to read the

7    signature or to somehow identify who the bearer of that ID card

8    was?

9    A    There wasn't, no.  I wasn't directed to even read it.

10   Q    Were you given any instructions as to confirm their

11   identity by use of -- by having them show their license or

12   other formal identification card?

13   A    I wasn't, no.  It was a quick glance.  Mostly, see the red

14   heart and know that they had a card.

15   Q    Well, what I asked you was there any requirement imposed

16   on you to check other -- other state ID or other licenses to

17   confirm their identity?

18   A    There was no requirement, no.

19   Q    Now, was there any requirement imposed by -- on you to

20   check your membership -- your ministry membership records to

21   make sure that this person who bore this card was a valid

22   member?

23   A    There was no requirement.

24        MR. KAWAHARA:  No further questions, Your Honor.

25        THE COURT:  All right.  Thank you.

```
 1              Cross-examination, Mr. Otake.
 2     CROSS EXAMINATION BY COUNSEL FOR DEFENDANT R. CHRISTIE
 3   BY MR. OTAKE:
 4   Q    Good morning, Ms. Walsh.
 5   A    Good morning.
 6   Q    My name is Tommy Otake.  I have a few questions for you
 7   this morning.  If you don't understand my question, ask me, and
 8   I can repeat it, okay?
 9   A    Okay.  Thank you.
10   Q    I'll start right where you left off or right where
11   Mr. Kawahara left off, I should say.  And he was talking about
12   the Express service and whether or not there was a requirement
13   to check IDs, okay?  And you said at least from where you were,
14   what your job was, you didn't check driver's license or
15   anything like that, correct?
16   A    Correct.
17   Q    But at the same time, though, oftentimes there -- in
18   addition to you being where you were, there was a doorman that
19   dealt with people coming into the ministry as well, right?
20   A    There was, yes.
21   Q    And the doorman as well would do things such as check
22   ministry card and check ID, yes?
23   A    I can't speak for the person at the door, but I was the
24   door person a few times and I was not instructed to check
25   anything other than the ministry ID card.
```

1   Q     Okay.  But there were times when there were other doormen

2   there, yes?

3   A     Yes.

4   Q     And you can't say whether they did or did not --

5   A     I cannot.

6   Q     -- check.  Okay.

7           Now, I'll come back to this Sanctuary Kit and other

8   things you're being asked about in a while.  But I want to kind

9   of start from the beginning because that's kind of where it

10  makes sense to start.  In your declaration you indicated that

11  you learned about the THC Ministry and a job opening there

12  through an advertisement on Craigslist, yes?

13  A     Yes.

14  Q     And that's Craigslist.com on the internet, right?

15  A     Yes, sir.

16  Q     Now, it wasn't any secret then that the THC Ministry

17  existed and that they were looking to hire staff, right?  It

18  was on the internet, yes?

19  A     Yes, sir.

20  Q     And you responded to the ad and eventually you were hired

21  there, yes?

22  A     Yes.

23  Q     Now, would you agree with me that just as they

24  openly -- the THC Ministry openly advertised on the internet

25  about the job position, the THC Ministry typically operated in

```
 1   a fairly open, nonsecretive manner, yes?
 2   A    I would say that's true in my experience, yes.
 3   Q    Okay.  And for example, you were aware that, let's start
 4   right with the physical location at the building in downtown
 5   Hilo -- well, first of all it was in downtown Hilo, right?
 6   A    It was, yes.
 7   Q    Oftentimes there would be a banner hanging outside of the
 8   window that said the THC Ministry, yes?
 9   A    Yes.
10   Q    And oftentimes that banner said, "We use cannabis
11   religiously and you can too."  Right?
12   A    That's correct, sir.
13   Q    Okay.  In addition to the banner, you were aware that
14   there were oftentimes ads placed in the paper, yes?
15   A    Yes.
16   Q    And that there also was a web site, right?
17   A    There was, yes.
18   Q    And I'll come back to the web site in a while, but you
19   talked about the Express operation in your web site -- I mean
20   in your declaration, and one of the things you said is that at
21   times the line was out the door, right?
22   A    That is correct.
23   Q    Okay.  So if anybody, law enforcement or otherwise, were
24   driving by on the street at the right time, they might see this
25   banner that says "we use cannabis religiously," yes?
```

```
 1   A     Yes.

 2   Q     And they might see a line going up into the building,

 3   right?

 4   A     Correct.

 5   Q     You say you were hired in January of 2009, does that sound

 6   right --

 7   A     That sounds right, yes.

 8   Q     -- after responding to the ad.  And one of the first

 9   things that you do is you go through an orientation, right?

10   A     Yes.

11   Q     And you talked about this orientation, and Roger was

12   there.  And you said there were about three to four other

13   people at the orientation, correct?

14   A     In that one, yes.

15   Q     And the orientation wasn't an orientation for new

16   employees, it was an orientation for potential new members,

17   yes?

18   A     That's correct.

19   Q     During this orientation, when Roger was there along with

20   you and these other people, Roger took the time to explain the

21   beliefs and the practices of the THC Ministry to those who were

22   present, right?

23   A     Yes, sir.

24   Q     He went over with you, I guess, the philosophies of the

25   ministry, right?
```

1    A    Yes, sir.

2    Q    And he talked to you about the need to be sincere, right?

3    A    Yes.

4    Q    And he talked to you about his beliefs as well as the

5    beliefs of the ministry, yes?

6    A    That's correct.

7    Q    And in the course of doing that, this might be an obvious

8    question, but you not only had a chance to see him, but he had

9    a chance to observe you and listen to you and see how you

10   reacted to what he was sharing with you, yes?

11   A    There was that opportunity, yes.

12   Q    You were told at this orientation that it was legal what

13   they were doing, right?

14   A    Yes.

15   Q    And this was an orientation for those appearing in person

16   and attempting to be a member, yes?

17   A    Yes.

18   Q    Okay.  Now in your declaration you talk about the

19   Ministry's operating hours, and you say how they were very

20   short only open Monday, Wednesday, Friday, from 2 to 5 p.m.  Do

21   you remember saying that?

22   A    I do, yes.

23   Q    Okay.  But what you were describing really was the time

24   period when the sacrament would be shared with others who would

25   show up, yes?

1    A    Yes.  The time period when the members could come in.

2    Q    Right.  The time period where the members could come in to

3    receive what was referred to as sacrament, right?

4    A    Yes, sir.

5    Q    But aside from those hours, Roger was there a lot more

6    than just those hours, right?

7    A    I can say that he was there when I was there, and I

8    would -- anything more than that, I didn't see so.

9    Q    Okay.  So you weren't there all the time then?

10   A    I was not there all the time, no.

11   Q    So if there were other times aside from these three days,

12   three hours a week where he was meeting and counseling others,

13   you wouldn't be aware of that because you weren't there?

14   A    That is correct.

15   Q    All right.

16   A    Unless I talked to him, right, on the phone and he said

17   I'm at the ministry.  So there's times that I knew but not all

18   the time.

19   Q    Okay.  So you do know that there were times aside from

20   these three hours, three days a week that he was at the

21   Ministry doing whatever else he may have been doing?

22   A    Yes, sir.

23   Q    All right.  But in terms of the time when members could

24   come and receive sacrament, it was limited to three days a week

25   for three hours a day, yes?

1    A    Yes, that's what I recall.

2    Q    And that's what you put in your declaration, right?

3    A    Yes.

4    Q    And so -- and that was a decision made obviously by Roger,

5    right?

6    A    Yes.  Absolutely.

7    Q    It's not as though Roger -- well, let me rephrase it.

8    It's not as though any day, every day, at any hour, someone

9    could come in and get cannabis.  It wasn't like that, was it?

10   A    No, not necessarily, it was not like that.

11   Q    All right.  Now, one of the things you say in your

12   declaration is that you weren't allowed to give out cannabis to

13   the members unless they could pay, absent permission from

14   Roger, right?

15   A    That is correct.

16   Q    But there were times that Roger would share cannabis with

17   others who could not pay, members that could not pay, right?

18   A    There were, yes.

19   Q    Okay.  You just couldn't do that without his permission,

20   right?

21   A    I couldn't do anything without Roger's permission, or

22   Sherry's, but generally Roger's.

23   Q    In fact, you do mention later in your declaration these

24   things called aloha bags, yes?

25   A    Yes.

1   Q    And that was, as you referred to it, free sacrament for
2   those who perhaps didn't have the means to pay, yes?
3   A    That's correct.
4   Q    With regards to the sharing of sacrament with those who
5   were there at the Ministry during these limited hours, you were
6   instructed by Roger that only Ministry members or those with
7   medical marijuana cards could obtain sacrament, correct?
8   A    Yes, that's correct.
9   Q    In other words, it's not as though he told you, hey,
10  whoever shows up who has some money, let them pay and let them
11  take it.  They had to be a member, right?
12  A    They had to be a member.
13  Q    And they had to also -- either that or they had to have a
14  medical marijuana card, right?
15  A    Yes.
16  Q    And one of the things you indicate though is that 85 to 90
17  percent of those who acquired cannabis were members, right?
18  A    Yes.
19  Q    In your experience, the remainder were those with state
20  medical marijuana cards, yes?
21  A    Yes.  That was my experience.
22  Q    And just to be clear, in your understanding, to have a
23  medical marijuana card that requires physician approval, yes?
24  A    That's my understanding, yes.
25  Q    Okay.  And again, just to be clear, Roger made the

1   decision of who would become members, not you, right?

2   A    That's correct, yes.

3   Q    All right.  Now, focusing again on this Express practice,

4   the one you talked about in your declaration at length, you

5   talked earlier about how they had to show their membership

6   card, right?

7   A    Yes.

8   Q    And Mr. Kawahara says, well, did you check the ID, did you

9   check the signature.  You don't know of any specific instance

10  where somebody used somebody else's card, do you?

11  A    No.  I didn't have any experience with that.

12  Q    All right.  We talked about the doorman.  One of the other

13  things that had to happen when people came in the door, other

14  than showing their -- in addition to showing their card, they

15  also had to wash their hands with hemp soap, right?

16  A    Yes.  That's correct.

17  Q    And to your understanding this was a symbolic practice

18  created -- well, enforced by Roger to make sure the people

19  understood the religious nature of the Ministry and what they

20  were about to do, right?

21  A    That was my understanding of his intent, yes.

22  Q    It was a symbolic practice that reflected sincerity, yes?

23  A    Yes.

24  Q    Roger also required anyone present -- any of the members

25  present to receive sacrament to have good manners and be

1    respectful, yes?

2    A    Yes.

3    Q    And that was kind of a big deal to him.  It's not like you

4    could come in here and be disrespectful and do whatever.  He

5    required manners and respect, yes?

6    A    That was my experience, yes.

7    Q    All right.  Now, you talked about some of the different

8    donation prices in your declaration, but I want to clarify a

9    few things about that.  You mentioned different amounts and,

10   you know, smaller amounts, larger amounts, but the truth is,

11   isn't it, for the most part the majority of those who came in

12   for sacrament would be making donations in the -- somewhere in

13   the $20 to $50 range, yes?

14   A    I would say the majority, yes.

15   Q    Okay.  And when you're talking the $20 to $50 range, in

16   your experience you're talking about enough cannabis for

17   possibly like one to three joints or something like that,

18   right?  I mean that's the kind of amounts we're talking about,

19   right, majority of the time?

20   A    I would say it depends on the size joint you roll.

21   Q    Okay.  That's a good point.  But typically that's what

22   you're talking about, is one to, you know, a small amount of

23   joints in other words, right?

24          MR. KAWAHARA:  Objection, Your Honor.  Asked and

25   answered.

```
 1            THE COURT:  Okay.  So before I rule on that, I see
 2   that one of your witnesses are here.
 3            MR. KAWAHARA:  Yeah, that's the case agent.
 4            THE COURT:  Yes, so he's going to be your -- I just
 5   wanted that clear on the record.
 6            MR. KAWAHARA:  Yes.
 7            THE COURT:  All right.  Thank you.  So overruled.  You
 8   can sit next to him.  Overruled.
 9            Do you have the question before you?  If not, he can
10   repeat it.
11            THE WITNESS:  If you could repeat it.
12   BY MR. OTAKE:
13   Q    Let me rephrase it.  Maybe the way I asked it wasn't, let
14   me rephrase it.  Like you said, the majority to your
15   recollection was the $20 to $50 range, yes?
16   A    Yes.
17   Q    All right.  And at least then, in your experience, the
18   majority of what was taking place was the sharing of smaller
19   amounts of cannabis for individual use, is what it appeared
20   like to you, right?
21            MR. KAWAHARA:  Objection.  That calls for a
22   conclusion, Your Honor.
23            MR. OTAKE:  No.  It's what it appeared like to her.
24            THE COURT:  Overruled.
25   BY MR. OTAKE:
```

1    Q    Yes?

2    A    I'm sorry.  Can you --

3    Q    And at least from what you observed and what you did, the

4    majority of the time it appeared to you that the cannabis being

5    shared were smaller amounts for individual use, yes?

6              THE COURT:  Wait.  Okay.  Now you're assuming facts

7    not in evidence.  How would she know it's for individual use?

8              MR. OTAKE:  I mean, as it appeared to her.  I mean,

9    well, in her mind.

10             THE COURT:  Well, I guess it sort of lacks foundation.

11   I would just ask her, in your mind, did you make any

12   determination how these people were going to use the sacrament

13   that was distributed -- not distributed -- the sacrament that

14   they received?

15             THE WITNESS:  I didn't make a determination about what

16   they were doing with it.

17             MR. OTAKE:  Okay.  All right.

18             THE COURT:  Yeah.

19   BY MR. OTAKE:

20   Q    Now, moving on to another subject, who wrote this

21   declaration, your declaration?

22   A    Mr. Kawahara drafted it.  I reviewed it.

23   Q    Okay.  And you understand Mr. Kawahara is the U.S.

24   attorney that was also prosecuting you in this case, right?

25   A    I do understand that, yes.

1  Q    And who is your attorney?

2  A    Alvin Nishimura.

3  Q    You understand that as you were charged in this case, you

4  were looking at a mandatory minimum of five years, right?

5  A    Yes.

6  Q    Okay.  And that you were charged with a conspiracy to

7  distribute marijuana involving over a hundred plants, yes?

8  A    I understand, yes.

9  Q    Okay.  Now, he drafts this, you review it, you sign it,

10 right?

11 A    I did sign it, yes.

12 Q    Okay.  And one of the things you say in here, or that he

13 wrote in here and then you adopted, was that you never advised

14 members of any restrictions on what they could do with

15 sacrament.  Do you remember that being in here?

16 A    I do, yes.

17 Q    And aside from what you may or may not have done, as far

18 as you know, Roger though in your experience would advise

19 members as to what they could or could not do with sacrament,

20 correct?

21        MR. KAWAHARA:  Objection to the extent this calls for

22 speculation on the part of what Mr. Christie does or doesn't

23 do, Your Honor.

24        MR. OTAKE:  As far as she knows.

25        THE COURT:  That 's it.  She needs to testify whether

 1    she knew that or not, so overruled.

 2            Do you know if Roger Christie ever told -- well, you

 3    can state the question.  Sorry.

 4    BY MR. OTAKE:

 5    Q    Are you aware in your experience of any information or

 6    instruction Roger Christie would give others about the

 7    restricted use of the sacrament?

 8    A    In my experience, Roger would explain it as religious use.

 9    Q    Okay.

10    A    But I don't recall details about, you know, A, B, and C of

11    what that means.

12    Q    Okay.

13    A    So you can do X, you shouldn't do Y, those kind of things.

14    Q    Now you're familiar with the web site, right?

15    A    I am, yes.

16    Q    And, in fact, at your grand jury testimony you were asked

17    about your knowledge of the web site, right?

18    A    Yes.

19    Q    Remember that?  Okay.

20            MR. OTAKE:  And, Your Honor, at this time if I could

21    publish a portion of the web site.

22            THE COURT:  No objection?

23            MR. KAWAHARA:  No objection, Your Honor.

24            THE COURT:  All right.  You may.

25    BY MR. OTAKE:

```
 1   Q    I'm going to show you a page on the web site.  Let me move
 2   it up a bit here.
 3        And he's talking about -- this is about the Sanctuary
 4   Kit, yes?
 5   A    It is, yes.
 6   Q    And then on the bottom there he talks about successful
 7   religious defense, the prosecution is based upon five
 8   qualities, do you see that?
 9   A    I do see that.
10   Q    You remember seeing that on the web site, yes?
11   A    I don't actually remember looking at it and the time
12   period that I read it, but I don't doubt that it exists there.
13   Q    Do you recall that one of the restrictions that Roger had
14   on this was, as it says at number one, sincerity, does that
15   sound familiar?
16   A    That sounds familiar, yes.
17   Q    I'm going to turn to the next page.  And it repeats
18   sincerity again.  But number two was legitimacy, yes?
19   A    It is, yes.
20   Q    Number three, he talked about a mandate to grow and use
21   cannabis.  Do you remember Roger talking about that?
22   A    Yes.
23   Q    Okay.  And then number four, sacrament must be used in
24   private, preferably at home or at church.  Do you recall that
25   being something Roger would share with others?
```

1    A    I see it on the web site.

2    Q    Okay.  Isn't it true at the orientation and other times

3    Roger would repeat, to your knowledge, that the cannabis

4    for -- was for use in private, at home, in church, or in the

5    tabernacles of nature.  Did you ever hear him say that?  Does

6    that sound familiar?

7    A    I don't recall if he said it at my orientation.  I didn't

8    sit through other orientations.

9    Q    Okay.

10   A    So I can't speak that it was said to that, but.

11   Q    Does that sound like something Roger would say?

12        MR. KAWAHARA:  Objection.  That calls for speculation,

13   Your Honor.

14        MR. OTAKE:  In your -- well, in your experience of

15   knowing Roger.

16        THE COURT:  Sustained.  Calls for speculation.

17   BY MR. OTAKE:

18   Q    Now, turning your attention to these Sanctuary Kits that

19   you mentioned in your declaration, okay?  So the Sanctuary Kits

20   were mailed to people, yes?

21   A    They were.  Yes, sir.

22   Q    And that's different from this process of orientation

23   where those people could come in, meet face-to-face with Roger,

24   and have a conversation with him, yes?

25   A    It's different.  There were people that came in and got a

1    Sanctuary Kit as well but.

2    Q    Okay.  But the Sanctuary Kit didn't necessarily require

3    you to come in, right?

4    A    Right.

5    Q    But the Sanctuary Kit that you guys mailed out, it was

6    mostly mailed to people outside of Hilo, yes?

7    A    Yes.  That's correct.

8    Q    And because a Sanctuary Kit was sent mostly outside of

9    Hilo, to your knowledge and to your experience, the people

10   receiving a Sanctuary Kit were not regular participants in the

11   Express system, would that be fair to say, in your experience?

12   A    In my experience, yes.  There was a few times that people

13   from out of state would come and visit.

14   Q    Okay.

15   A    And so they were like I'm a member and I'm here now.

16   Q    But that was pretty rare, right?

17   A    That was pretty rare, yes.

18   Q    Okay.  Most of the people that came through the Express

19   system were from Hilo, yes?

20   A    That is correct.

21   Q    The Sanctuary Kit itself, I want to talk to you a little

22   more about that in detail because Mr. Kawahara was asking you

23   about that today.

24        Now, there were plant tags in the Sanctuary Kit,

25   right?

```
 1   A     That is correct, sir.

 2   Q     And just to be clear, that's a piece of plastic that you

 3   can attach to a plant, right?

 4   A     Yes, sir.

 5   Q     And this may sound obvious, but the Sanctuary Kit did

 6   not -- it had plant tags, but it did not mail out actual

 7   plants, did it?

 8   A     No live plants.

 9   Q     Okay.  There was a sanctuary sign, yes?

10   A     Yes, there was.

11   Q     There were bag tags, and you were asked about -- well, in

12   your declaration you mentioned the bag tags, yes?

13   A     They were there, yes.

14   Q     Now, again, this may be clear, but I want to make it

15   crystal clear, there were bag tags that were sent out, but

16   there were not bags of cannabis mailed out, right?

17   A     There were not bags of cannabis.

18   Q     There was a certificate and ID cards, right?

19   A     Yes.

20   Q     And in addition, there was a small bottle of holy

21   anointing oil, right?

22   A     Yes.

23   Q     Now, the holy anointing oil, I want to talk to you about

24   that, that basically was, again this sounds obvious, but it was

25   an oil, right?
```

1    A    It was olive oil and some essential oils.

2    Q    Yeah, it was basically olive oil with some other things

3    mixed in, right?

4    A    Yes.

5    Q    And you couldn't, in your -- to your knowledge and

6    experience, you couldn't smoke the holy anointing oil, could

7    you?

8    A    I never smoked holy anointing oil.

9    Q    Right.  You never did, right?  You couldn't really

10   vaporize it or get high off it, right?

11   A    I don't think so.  It was made with cannabis though.

12   Q    Okay.  But it was made with relatively symbolic levels of

13   cannabis, wouldn't you agree?

14        MR. KAWAHARA:  Objection.  That calls for speculation,

15   Your Honor.

16        THE COURT:  Sustained.  Lack of foundation --

17        MR. OTAKE:  Okay.

18        THE COURT:  -- unless she knows how it was made.

19   BY MR. OTAKE:

20   Q    You mentioned it was made with cannabis, so you're

21   familiar to some degree with the recipe of this oil, right?

22   A    Yes.

23   Q    And it was in large part oil, like you said, olive oil,

24   yes?  Yes?

25   A    Olive oil, yes.

1   Q    And symbolic amounts of cannabis, right?

2        MR. KAWAHARA:  Objection, Your Honor, to the use of

3   the word, "symbolic."

4        THE COURT:  Well, if she understands the question she

5   can answer it.  Overruled.

6        Do you understand the question?

7        THE WITNESS:  I understand the question.

8   BY MR. OTAKE:

9   Q    Right?

10  A    I think symbolic means different things to different

11  people.

12  Q    Let me use a different word then, okay, because that's a

13  fair response.  In other words, the purpose of the holy

14  anointing oil itself was symbolic, yes?  Right?

15  A    Yes.

16  Q    In other words, it's not as though it was something that

17  somebody wanting to get high or wanting to smoke cannabis would

18  really have any use of, right?  Right?

19       MR. KAWAHARA:  Objection to the extent she knows, Your

20  Honor.

21       THE COURT:  So you're saying a lack of foundation?

22       MR. KAWAHARA:  Yes.  I think in terms of the question

23  that's being posed.

24       THE COURT:  All right.  Well, first of all, do you

25  know what other people did with the oil?

```
 1              THE WITNESS:  Not -- I didn't experience anyone using
 2    the oil.  I know what Roger would have said the oil is used
 3    for.  I've heard him say that.
 4    BY MR. OTAKE:
 5    Q    Okay.
 6    A    I didn't use the oil, so that's --
 7    Q    Okay.
 8              THE COURT:  So sustained.  She doesn't know, yeah.
 9    BY MR. OTAKE:
10    Q    What did Roger say the oil was used for?
11    A    For healing.
12    Q    For healing?
13    A    For anointment.
14    Q    For anointment, right?
15    A    Yes.
16    Q    He didn't say to smoke it, did he?
17    A    No.  He didn't say to smoke it.
18    Q    Okay.  So in terms of the Sanctuary Kit, aside from the
19    holy anointing oil and what that was used for and not used for,
20    there wasn't any live plants in it, was there?
21    A    No, sir.
22    Q    There wasn't any bagged cannabis, was there?
23    A    No.
24    Q    It was in large part an informational packet, yes?
25    A    Yes.
```

1    Q    Now, you would agree that in your experience working there

2    and observing Roger, he wasn't a money motivated guy, would you

3    agree with that?

4    A    I would agree that that's my experience, yes.

5    Q    Okay.  And you signed up and agreed to work there because

6    you believed that he was operating a legitimate ministry,

7    right?

8    A    I did, yes.

9    Q    Okay.  In other words, you would never have agreed to work

10   there had you believed it was just a front for drug dealing,

11   would you have?

12   A    I would not have.

13   Q    Never would have, right?

14   A    Never would have.

15   Q    Did you know how many plants was at the farm being run by

16   the people with the last names Mann and Friend?

17   A    I would say that that number may have been told to me, but

18   I don't remember it.  And I didn't hold on to it.

19   Q    You had no personal knowledge of how many plants that was

20   or was not at the farm?

21   A    No.

22   Q    Okay.  But you pled guilty to being part of a conspiracy

23   to distribute marijuana involving more than a hundred plants?

24   A    I did.

25   Q    Okay.  While you were working there, during your time

1   period working there -- and I don't have that many more

2   questions, okay, just a few more.  In your time period working

3   there, you know, we talked about the banner and the lines and

4   the ads and the public nature of the Ministry, did law

5   enforcement ever come by and come into the Ministry and ask,

6   hey, what's going on or anything like that?

7   A    I saw law enforcement not come upstairs, but definitely

8   downstairs.

9   Q    Okay.  So it was clear to you that -- well, was it clear

10  to you that at least to some degree certain law enforcement

11  people were aware of the Ministry?

12          MR. KAWAHARA:  Calls for speculation on the part of

13  this witness, Your Honor.

14  BY MR. OTAKE:

15  Q    From what you observed.

16          THE COURT:  Well, overruled.  She's testified that, I

17  don't know how, but she recognized law enforcement --

18          MR. OTAKE:  So --

19          THE COURT:  -- inside the physical plant of the

20  Ministry.

21  BY MR. OTAKE:

22  Q    Well, let me ask you this, in other words, it's not like

23  they just were driving by or walking by, but you saw them in

24  the area and it seemed that they're -- from what you observed

25  that they were interested in kind of what was going on over

1    there, right?

2    A    I saw them in the area.  I would say that it was very

3    visible.  And I can't say for sure that they acknowledged that

4    it was present, but it would be hard not to for people.

5    Q    But at least while you were there, did any law enforcement

6    come upstairs and say, hey, we want to talk to the person

7    running this operation?

8    A    No.  I don't remember that.

9    Q    Okay.  Did any law enforcement personnel come upstairs and

10   make any suggestions on how you guys could do things better?

11   A    No.  I don't remember that happening.

12   Q    Now, only if you know but from what you know of Roger, in

13   your experience there, would Roger have talked to law

14   enforcement people had they come by?

15            MR. KAWAHARA:  Objection.  Calls for speculation, Your

16   Honor.

17            THE COURT:  Sustained.

18            MR. OTAKE:  Your Honor, one second, if I could just

19   check with my client.

20            THE COURT:  You may.

21   BY MR. OTAKE:

22   Q    Just a couple more questions, Ms. Walsh.  Thank you.

23            Throughout the course and scope of your employment

24   there and your knowledge of Roger, were you aware that at times

25   Roger would go and speak at county council meetings and public

 1    events and things like that?

 2    A     He relayed that information to me, yes.

 3    Q     You understood that he would go to these meetings and

 4    share about the THC Ministry and things that he was involved

 5    in, yes?

 6    A     I never went to any of them with him or --

 7    Q     Okay.

 8    A     -- without him, but he did say I went and spoke here, I

 9    wrote a letter to this person.  Those kinds of things.

10              MR. OTAKE:  Okay.  Thank you.

11              THE WITNESS:  You're welcome.

12              MR. OTAKE:  No further questions.

13              THE COURT:  Ms. Panagakos, your witness.

14              MS. PANAGAKOS:  Thank you, Your Honor.

15        CROSS EXAMINATION BY COUNSEL FOR DEFENDANT S. CHRISTIE

16    BY MS. PANAGAKOS:

17    Q     Good morning, Ms. Walsh.

18    A     Good morning.

19    Q     My name is Lynn Panagakos.  I represent Share Christie.

20    Now you said that -- just a moment.

21              I believe you testified when Mr. Otake was questioning

22    you or Mr. Kawahara, I'm not sure, that you couldn't do

23    anything without Roger's permission or Share's but generally

24    Roger, correct?

25    A     That is true.

1   Q    So was the situation with Share only when Roger's ankle

2   was broken?

3   A    Then Share would be the person that would say what.

4   Q    That was the time?

5   A    Yes.

6   Q    That was the only time?

7   A    It was close to like a manager and assistant manager, so

8   Share had a say.  She would, you know, Roger would listen to

9   her opinion on things, and then Roger would generally say yea

10  or nay to whatever the topic was.

11  Q    The only time she was involved in the Express procedure

12  was during the time that Roger's ankle was broken?

13  A    I can't recall.

14  Q    Okay.  Do you know how long Roger -- do you remember when

15  his ankle was broken?

16  A    I don't remember the date.  I remember the occurrence

17  though, yes.

18  Q    And was he then -- at that time, did Share come in more

19  often?

20  A    She did, yes.

21  Q    Okay.  And how long did that last that Share was there

22  more often?

23  A    I can't say with certainty.

24  Q    Was it a couple of months?

25  A    It might have been a couple of months.  My best estimate

```
 1   would be less than three and more than one.
 2   Q    Do you recall testifying before the grand jury in August
 3   of 2010?
 4   A    I do, yes.
 5   Q    Okay.  And you testified about your application after you
 6   saw the ad in Craigslist, right?
 7   A    Yes.
 8   Q    And who interviewed you?
 9   A    Roger did.
10   Q    And then who defined your duties?
11   A    Roger did.
12   Q    And who conducted the orientation?
13   A    Roger did.
14   Q    And you talked about prayer circles being conducted in the
15   morning, was that a routine occurrence?
16   A    That was a routine occurrence, yes.
17   Q    Okay.  Did that happen pretty much every day before the
18   Ministry opened?
19   A    Pretty much every day, yes.
20   Q    Okay.  And it was Roger and you and the doorman and
21   generally one other employee; is that correct?
22   A    And Share.  And anyone else that was working at that time.
23   So if there was someone there cleaning, they joined.  If there
24   was anyone that was working, it was a good team event.
25   Q    I'd like to present the witness with a copy of her grand
```

1    jury testimony, and it's marked Defendant's Exhibit P.

2            THE COURT:  Any objection, Mr. Kawahara?

3            MR. KAWAHARA:  Showing her the grand jury testimony, I

4    have no objection to that.

5            THE COURT:  If you put it on the Elmo, then it'll show

6    it to her on her screen.

7    BY MS. PANAGAKOS:

8    Q    Do you see your testimony starting at line 17 describing

9    the prayer circle?

10   A    I do, yes.

11   Q    And you described it as being the people that were

12   working, correct?

13   A    Yes.

14   Q    There's no mention of Share there, is there?

15   A    I would say that Share counts as the people that were

16   working.

17   Q    Okay.  Someone on Express, that would be you, correct?

18   A    That would be myself or there was a couple of other people

19   that did Express, yes.

20   Q    And -- during this testimony, the only time you described

21   Share working at Express was while Roger's ankle was broken; is

22   that correct?

23   A    Probably, yes.

24   Q    And it was -- did Heather Duffy have a role in getting

25   that procedure set up?

```
 1   A     She did, yes.

 2   Q     It was she who recommended it, right?

 3   A     She did, yes.

 4   Q     And I believe you testified in your grand jury testimony

 5   that the reason Roger went forward with Express was because he

 6   felt like he was able to help more people; is that correct?

 7   A     Can I see that on my testimony?

 8   Q     Well, I'll start at page -- do you see at the bottom of

 9   page 40 the grand juror is asking you, "Did you ever hear that

10   in conversations whether he was more interested in promoting

11   marijuana as a product to make money off the sale?"  And do you

12   see your answer --

13         THE CLERK:  I'm sorry, Ms. Panagakos.  Can you go to

14   the microphone.

15   BY MS. PANAGAKOS:

16   Q     Do you see the question from the grand juror starting at

17   line 24 of page 40:  "Did you ever hear that then in

18   conversations whether he," that would be Roger, "was more

19   interested in promoting marijuana as a product to make money

20   off of the sales?"  Do you see that question?

21   A     I do, yes.

22   Q     And do you see your answer?  "The only thing I ever heard

23   from Roger is that he believed that marijuana should be

24   liberated and that anyone that wanted it should have it.  He

25   never mentioned being happy necessarily about the money.  He
```

1   mostly talked about helping people.  He went forward with the

2   Express because he felt like he was able to help more people is

3   the way he put it."

4   A    Okay.  Yes.

5   Q    And was that his reason for going forward?

6            MR. KAWAHARA:  Objection.  That calls for a conclusion

7   on what Mr. Christie's motives may have been.

8            THE COURT:  All right.  To the extent that you formed

9   an impression, I'm going to overrule the objection.

10           THE WITNESS:  I did.  I formed an opinion definitely

11  that Roger wanted to help people.  I know because I was there

12  when Heather presented the idea of Express that she presented

13  it in a way that more people could be seen to receive

14  sacrament.

15  BY MS. PANAGAKOS:

16  Q    And the majority of the people purchased or received $20

17  to $50 worth; is that correct?

18  A    That I saw, yes.

19  Q    Now, as far as the farm, it was your understanding when

20  you were working at the Ministry that Susanne Friend only ever

21  delivered shake to the Ministry; is that correct?

22  A    That is correct.

23  Q    So you had no knowledge of, at the time you were working

24  there, the relationship between the Friend and Mann and Mr. and

25  Mrs. Christie?

 1   A     Can you repeat that?  I'm sorry.

 2   Q     Other than Susanne Friend supplying shake to the Ministry,

 3   did you have any other knowledge of any other role she had at

 4   the Ministry?

 5   A     I didn't, no.

 6   Q     You were asked about the web site during your grand jury

 7   testimony, weren't you?

 8   A     I believe so, yes.

 9   Q     And you saw at that time the web site's emphasis on

10   sincerity, correct?

11   A     I saw that, yes.

12   Q     And you resigned after the search of the premises in March

13   2010; is that correct?

14   A     That is correct.

15   Q     And at that time Roger told you that your sincerity would

16   be your defense; is that correct?

17   A     He did, yes.

18   Q     And it was Roger who -- do you know when Share met Roger?

19   A     Do I know when Share met Roger?

20   Q     Uh-huh.

21   A     No, I don't know.

22   Q     Do you know when the Ministry was formed?

23   A     No, I don't know.

24   Q     As part of the orientation, he gave you background on the

25   Ministry, right?

1    A      He did, yes.

2    Q      Are you aware that Share met Roger years after it was

3    formed?

4    A      I would say yes.

5    Q      And so it was Roger who set the tenets of the Ministry,

6    correct?

7    A      That is correct.

8    Q      And it was Roger who set the procedures for the Express,

9    correct?

10   A      It is like I said before, Share played a role in how it

11   was managed to the extent that her opinion was heard.  She

12   provided her opinion, it was heard, and Roger made a decision.

13   Q      When Roger was at the Ministry, Share spent most of her

14   time at the farm in Puna, didn't she?

15          MR. KAWAHARA:  Objection.  How would the witness know

16   that, Your Honor?

17          THE COURT:  Sustained.  If you can lay a foundation.

18   BY MS. PANAGAKOS:

19   Q      She spent far less time at the Ministry when Roger was

20   present there, is that correct, than when he wasn't?

21   A      Did you say she spent far less time?

22   Q      Less time at the Ministry when Roger was not injured.

23   A      She spent less time at the Ministry when Roger was not

24   injured, but she did spend plenty of time at the Ministry.

25   Q      She didn't work at the Express desk itself, did she?

```
 1   A    There were a couple of times she did, yes.

 2   Q    A couple of times?

 3   A    Uh-huh.

 4   Q    And when you worked there, there were quite a few other

 5   workers, correct?

 6   A    There were, yes.

 7   Q    There was Heather?

 8   A    Heather, yes.

 9   Q    Victoria?

10   A    Victoria, yes.

11   Q    David Wallersteen?

12   A    Yes.

13   Q    Ann Timbers?

14   A    Yes.

15   Q    Laura Krivo?

16   A    Yes.

17   Q    And Gwen?

18   A    Gwen.

19   Q    And Julie?

20   A    Julie, yes.

21   Q    And to your knowledge, all of these people were paid,

22   correct?

23   A    To my knowledge, they were.  There were other people as

24   well besides them.

25   Q    And rent was paid for the premises, correct?
```

1           MR. KAWAHARA:  Objection.  To the extent she knows,

2    Your Honor.

3           THE COURT:  Do you know whether or not rent was paid?

4           THE WITNESS:  I believe rent was paid, yes.

5           MS. PANAGAKOS:  May I have a moment, Your Honor?

6           THE COURT:  You may.

7           MS. PANAGAKOS:  Nothing further, Your Honor.

8           THE COURT:  All right.  Thank you.  Mr. Kawahara,

9    redirect.

10          MR. KAWAHARA:  Yes, Your Honor, thank you.

11                    REDIRECT EXAMINATION

12   BY MR. KAWAHARA:

13   Q    Ms. Walsh, you were asked on cross-examination the extent

14   of your knowledge of Susanne Friend's involvement, do you

15   remember that testimony?

16   A    I do, yes.

17   Q    Now, while you were working at the Ministry, is there any

18   reason why you would not have known what possible involvement

19   Susanne Friend may have had with the Ministry?

20   A    There is reason.  When Roger met with people who I -- so

21   sometimes we would run out of sacrament and we wouldn't see any

22   members.  And then someone would come in, and Roger would say I

23   don't want anyone in here, I'm going to meet with this person

24   privately.  And then when they were finished with the meeting,

25   we would reopen and have sacrament again.

1          So that led me to believe potentially that that person

2     brought sacrament and -- but I wasn't included in the meeting.

3     It was very private.

4     Q    So in other words, what you're saying is that at least on

5     the supply side neither Roger nor Share indicated to you or

6     identified to you where they were getting sacrament from?

7     A    Not -- no.  I mean occasionally I would make --

8     Q    Well, the question is did they tell you?

9     A    They didn't tell me, no.

10    Q    I see.  So there was a question of a need to know on your

11    part?

12    A    A need to know?

13    Q    I guess, did you need to know?  That's why you weren't

14    told?

15    A    They definitely thought I did not need to know.

16         THE COURT:  I'm sorry.

17         MR. OTAKE:  Objection, leading.  Argumentative.  Calls

18    for speculation.

19         MR. KAWAHARA:  Argumentative?

20         THE COURT:  Well, you can't object to his objection,

21    so let's let him finish.  Okay.  So it's sustained.  It is

22    leading and argumentative.  No, I mean, it's leading.  So go

23    ahead.  Why don't you --

24    BY MR. KAWAHARA:

25    Q    What I'm trying to ask you was if Roger or Share told you

1    about things like who their suppliers were, then you would

2    know, but did they tell you or did they not tell you?

3    A    They did not tell me.

4    Q    I see.  So there were aspects of the Ministry then that

5    you were aware of, like the sign in front, things like that,

6    but were there other aspects of the Ministry that you just

7    weren't told about by anyone?

8    A    Yes.

9    Q    There was some discussion during the cross-examination too

10   about Express.  Now, when Express first started, do you recall

11   hearing what -- do you recall if -- hearing if Sherryanne

12   Christie voiced any opinion about Express, pro or con?

13   A    About Express what?

14   Q    About the Express procedure.  Do you recall what

15   Sherryanne Christie may have said in your presence about

16   Express, the Express procedure?

17   A    I don't recall.

18   Q    Did she say anything about Express or whether it was good

19   or for bad?

20   A    She thought it was, my understanding is that it was good.

21   She thought it was good because --

22   Q    Is that what she said?

23   A    That is what she said, that it was good, because Roger

24   spent time with each member and so fewer members could be seen.

25   Q    And by the Express procedure, because Roger was not, did

1   not have to spend time with them, more people could be seen?

2   A     Yes.

3   Q     And more -- what about the sacrament?

4   A     More sacrament would be distributed.

5   Q     I see.  Now, there were also -- there was also some

6   questions posed to you about what was on the web site, about

7   what Roger may have said about the use of the sacrament.  Do

8   you remember those questions?

9   A     I do, yes.

10  Q     You know, when the Express procedure that you described in

11  your declaration, when that Express procedure is followed, what

12  involvement -- what direct involvement did Roger, or when Share

13  was present, what involvement did they have in that Express

14  procedure with the customers?

15  A     If a member was needy, like they would say, I really want

16  to talk to Roger, I want to meet with Roger, more often than

17  they would want to meet with Share, that would be accommodated

18  occasionally.  At some frequency, that would be accommodated.

19  Q     But in most instances for -- if people had the money and

20  they provided the money that was the requested donation, they

21  showed their card, would they have to see Roger at all to be

22  able to get the sacrament?

23  A     No.

24  Q     And so if you did not give them that instruction about

25  what sacrament could be used for, then nobody did during, for

1    the Express procedure, would that be correct?

2    A    That would be correct.

3         MR. OTAKE:  Objection, it's leading.  It's also

4    argument.  It's leading.  It's his witness.

5         THE COURT:  Well, it is leading, so sustained.

6    BY MR. KAWAHARA:

7    Q    You did not -- you indicated in your direct examination,

8    you did not give any instruction about what the sacrament could

9    be used for?

10   A    I gave no instruction.

11   Q    And unless the customer asked, was there any contact

12   with -- with Roger involved in the Express procedure?

13   A    No contact.

14   Q    You discussed before the question of -- or there was some

15   discussion in the cross-examination about sacrament and aloha

16   bags.  Let's talk about those aloha bags first.  What kind of

17   marijuana was contained in those aloha bags?

18   A    If -- if possible, it was the shake.  So the stems, the

19   leaves, the trimmings.

20   Q    And are you familiar with the term shake and buds?

21   A    I am, yes.

22   Q    What are buds?

23   A    The flowers.

24   Q    The marijuana flowers?

25   A    Uh-huh.

1    Q    Is that what the more desirable part would be for smoking

2    purposes?

3    A    That is the more desirable.

4    Q    And is that what was being sold as sacrament?

5    A    That was the sacrament, yes.

6    Q    What about shake, what did shake consist of?

7    A    Shake was the stems, the leaves, the trimmings, the less

8    desirable parts of the plant.

9    Q    That would have been what is left over, what you cut off

10   to process the buds?

11   A    Yes.

12   Q    And have you had the opportunity to use both buds and

13   shake?

14   A    I have, yes.

15   Q    What's the quality of the shake?

16   A    It is headache providing, for me.  I received a headache

17   after smoking shake.

18   Q    And you did indicate in your declaration primarily it was

19   shake that was used, provided for in those free aloha bags?

20   A    If it was available, yes.

21   Q    Now, let's talk about the buds.  You were asked some

22   questions about whether the buds could be provided at less than

23   the donation cost.  Do you remember that?

24   A    I do, yes.

25   Q    And was that a unusual occurrence only permitted by Roger?

1   A     It was only permitted by Roger.  It was requested

2   frequently by members, and sometimes it was accepted and

3   sometimes it was not.

4   Q     But generally speaking, the people who came for Express,

5   did they pay you the full amount?

6   A     Generally speaking, yes.

7   Q     Now, you were also asked about, questions before that,

8   whether you yourself would know if someone was using someone

9   else's membership card.  Do you remember that during

10  cross-examination?

11  A     I do, yes.

12  Q     How would you know if someone was using someone else's

13  membership card?

14  A     I wouldn't know.

15  Q     And were there also occasions where you were talking to

16  people with respect to joining the Ministry where they wanted

17  to use -- they did not want to use their real names?

18  A     There were, yes.

19  Q     And was that permitted?

20          MR. OTAKE:  Objection, calls for hearsay.

21          MR. KAWAHARA:  No.  She said --

22          THE COURT:  Wait, stop.  Okay.  Let me look at the

23  testimony.  Overruled.  It was when she was speaking to people,

24  did she know of instances where they did not want to use their

25  real names.  So the objection is overruled.

```
 1          MR. OTAKE:  And just to make the record clear, my
 2   objection is to what the people's responses were to her.
 3   That's clearly hearsay if he's trying to say that there were
 4   people who were interested in not using their real names.
 5   That's nothing but hearsay, Your Honor.
 6          MR. KAWAHARA:  But it's an indication, Your Honor.  It
 7   doesn't necessarily have to go to the truth of the matter --
 8          MR. OTAKE:  But asked --
 9          MR. KAWAHARA:  -- and what they said.
10          MR. OTAKE:  If it doesn't go to the truth, then what's
11   the relevance of it to this proceeding?  Obviously, he's trying
12   to show it for the truth and then it's hearsay.
13          THE COURT:  All right.  So it's overruled.  You're
14   asking for her understanding, what did she take from these
15   conversations, and it goes to her knowledge.
16          MR. KAWAHARA:  Yes.
17          THE COURT:  It's not going to be received for the
18   truth of whether these people are using their real names or
19   not.
20          MR. KAWAHARA:  No.  But it goes to the practices of
21   the Ministry and the like --
22          THE COURT:  Right.
23          MR. KAWAHARA:  -- with respect to, were these -- these
24   people indicated to you they did not want to use their real
25   names when you were talking about membership?
```

1          THE COURT:  So now you're asking her for the hearsay

2     though.

3          MR. KAWAHARA:  No.

4          THE COURT:  Yeah.  You're saying did they indicate to

5     her.

6          MR. KAWAHARA:  Did they ask you -- I'm just asking,

7     did they tell you -- did they give you any kind of indication

8     that they did not want to use their real names, were they still

9     accepted as members?

10         MR. OTAKE:  But that's still hearsay.

11         MR. KAWAHARA:  No.  It's the whole question of, the

12    whole issue here, Your Honor, is the question of the legitimacy

13    of membership and the extent to which, say, the Ministry cared

14    about it.  That goes to -- I think in the Lepp decision, that

15    is an important factor.

16         THE COURT:  Except you're asking her for the hearsay.

17         MR. OTAKE:  Right.

18         THE COURT:  So, I mean, I don't want to be overly

19    technical on this, we don't have a jury here, but I'm going to

20    sustain the objection.

21         Basically what he's asking you is after dealing with

22    these people in the role that you played with regard to the

23    Express procedure, did it become part of your understanding

24    that some people were apparently not using their real names?

25         MS. PANAGAKOS:  Your Honor, I have another objection,

1    and that is that the Court has found that we have met our prima

2    facie burden.  We're not here to challenge the legitimacy of

3    the religion, but only the government's compelling interest in

4    preventing diversion and whether this is the least restrictive

5    means.  It's not about an attack on sincerity, and if that's

6    the case, that's why it needs to go to the jury.

7            THE COURT:  No.  I think this is absolutely relevant

8    to the government's burden.  It doesn't have to do with the

9    sincerity --

10           MR. KAWAHARA:  No.

11           THE COURT:  -- of the defendants or any belief in it,

12   it has to do with, just like in I think the Lepp decision where

13   the judge, you know, noted that the marijuana fields were

14   unfenced, they were clearly observable, and that people could

15   come and help themselves.  I believe Mr. Kawahara's point is

16   that people could come in and not even -- the argument is not

17   even use their real names because they just want to get the

18   card.  And nothing was done to make sure that they didn't want

19   to use it for illegal purposes as opposed to religious.  Yes.

20           MR. OTAKE:  And I understand the relevance of that,

21   Your Honor, but I'm objecting to her saying what other people

22   said.  Mr. Kawahara had plenty of notice, and if he could find

23   someone that was actually using a false name, they should be

24   the ones testifying to it.

25           THE COURT:  Right.

1          MR. OTAKE:  Not her.

2          THE COURT:  But that's why we want this witness's

3    understanding.  I mean here she's having interaction.  You're

4    asking her did she observe law enforcement.  She's using -- not

5    that, you know, what would be hearsay was did people come up,

6    did they say they were in law enforcement, did they say I want

7    this, that and the other thing.  What did she observe, did you

8    ever see law enforcement there.  So same thing, when these

9    people come in, based on her interactions with them, did she

10   come to an understanding that whatever he wants to.

11         You're right, he can't ask her what did they tell you.

12   I'm not using my real name because I only want the illegal

13   stuff.  You're right, that would totally be hearsay.

14         MR. OTAKE:  Sure.  If the question is simply was it

15   your understanding from your experience, you know.

16         THE COURT:  Right.

17         MR. OTAKE:  But not what people told her.  Just from

18   what she observed --

19         THE COURT:  Right.

20         MR. OTAKE:  -- then that's one thing.

21         THE COURT:  So then you can question her on whether

22   her observations, understandings, conclusions were reasonable

23   or not --

24         MR. OTAKE:  Right.

25         THE COURT:  -- but he's asking her, some of the people

1    who came, because she's involved, she's testified amply and

2    laid a foundation that she's involved with this procedure.

3           MR. OTAKE:  And I'm still saying that's different from

4    what he was asking, so I'm objecting.

5           THE COURT:  I agree.  I agree.  So the objection to

6    hearsay is sustained as to the way it was asked, but you can

7    ask her about her understanding from interacting with the

8    people who came through the Express procedure.

9    BY MR. KAWAHARA:

10   Q    Yeah, okay.  Did you have any understanding when you were

11   working at Express and seeing people with their identification

12   cards whether they were using their real names or not?

13   A    I had no indication.  I never checked their driver's

14   license.

15   Q    But did you ever suspect at times that there were issues

16   about who they really were?

17   A    I suspected at times because there were members who

18   clearly said to me that --

19          MR. OTAKE:  Objection --

20          THE WITNESS:  Sorry.

21          MR. OTAKE:  -- as to what members said, Your Honor.

22          MR. KAWAHARA:  Well, we're talking about her

23   understanding, so she can rely upon what people said to her.

24          MR. OTAKE:  But then that's the whole point of what

25   hearsay is, right?

1          MR. KAWAHARA:  No.

2          MR. OTAKE:  I mean --

3          THE COURT:  Okay.  Stop, stop.  It's sustained.  But

4    she can say that she did suspect that, based on what her

5    interactions with these people, and that's her testimony right

6    now.  So you can follow up.

7    BY MR. KAWAHARA:

8    Q    And even though there was that, that did not stop them

9    from being able to acquire sacrament; is that correct?

10   A    That is correct.

11   Q    You were also asked some questions by Mr. Otake concerning

12   Roger Christie and finances and money.  Do you remember that?

13   A    I do, yes.

14   Q    Did Roger Christie ever talk to you about having a grand

15   day, G-R-A-N-D?

16   A    He did, yes.

17   Q    And did he explain to you what he meant by having a grand

18   day?

19   A    Yes.

20   Q    And what was that?  What did he tell you?

21   A    It meant that it was grand in terms of it was happy

22   because he made a grand, meaning $1,000.

23   Q    A grand being the slang for $1,000 from what?  A grand

24   from what?

25   A    From the donations accepted for sacrament.

1    Q    And that would be for the time that when he -- when the

2    Ministry would be opened, those three days a week, from 2:00

3    to 5:00?

4    A    I would assume that.  There's a possibility that he was

5    there earlier or later but.

6    Q    I see.  I see.  Now, did Roger Christie also talk about a

7    concept called ganganomics?

8    A    He did, yes.

9    Q    What did he say about that?

10            MS. PANAGAKOS:  Objection, Your Honor.  That's beyond

11   the scope of --

12            MR. KAWAHARA:  No, that was raised in her --

13            THE COURT:  Wait, wait.  Let her finish.

14            MR. OTAKE:  I'm going to have to ask Mr. Kawahara to

15   stop interrupting when we object.

16            THE COURT:  I agree.

17            MS. PANAGAKOS:  It was beyond the scope of any cross.

18            MR. OTAKE:  I join in that.

19            MR. KAWAHARA:  It was raised -- the question was

20   raised, Your Honor, during cross-examination about what, her

21   understanding about Mr. Christie and money.  And I think this

22   is, that this is -- this clearly opened the door for this.

23            THE COURT:  Overruled.  I agree.  All right.  So he's

24   asked you a question about ganganomics.

25   BY MR. KAWAHARA:

1    Q    Do you recall that term?

2    A    I do, yes.

3    Q    What do you recall Mr. Christie talking about that?

4    A    I would be paraphrasing, but I would say it was generally

5    the economy between a grower growing enough that they could

6    then support themselves by distributing it, so they would make

7    a profit to continue their garden and buy their groceries, for

8    example, or something like that.

9    Q    And who would they be -- under this concept of ganganomics

10   who, according to Mr. Christie, would they be providing their

11   harvest to?

12   A    The way he explained it to me would be that the members

13   would grow enough for themselves and to provide back to the

14   Ministry, so that the Ministry could then provide to additional

15   members.

16   Q    I see.  And would the Ministry be donating something back

17   for this donation of sacrament received from the growers?

18   A    I'm not sure.

19            MR. KAWAHARA:  No further questions, Your Honor.

20            MR. OTAKE:  Just brief follow-up.

21            THE COURT:  You may.

22     RECROSS EXAMINATION BY COUNSEL FOR DEFENDANT R. CHRISTIE

23   BY MR. OTAKE:

24   Q    Ms. Walsh, you were asked about this grand day.  That was

25   pretty rare, yes?

```
 1   A      Pretty rare.

 2             MR. KAWAHARA:  Objection.  To the extent she knows,

 3   Your Honor.

 4             THE COURT:  Well, she's already testified he said that

 5   to her.  So you're asking her, it was rare that he said that to

 6   her.

 7             MR. KAWAHARA:  No, I think he was asking --

 8             THE COURT:  Well, I'm asking him.  Are you asking if

 9   it was, she rarely heard that?

10             MR. OTAKE:  Yeah, yeah.  I'm following up with what he

11   asked.

12             THE COURT:  All right.  So the --

13             MR. OTAKE:  Let me add a couple words.

14             THE COURT:  First, the objection is overruled.  Go

15   ahead.  Did you want to rephrase?

16             MR. OTAKE:  I can so.

17             THE COURT:  Okay.

18   BY MR. OTAKE:

19   Q    So Mr. Kawahara asked you about times when you would hear

20   Roger say it was a grand day, and you said your explanation of

21   that had to do with this money issue.  I mean, it was pretty

22   rare that he would say that, yes?

23   A    A few times that he told me it was a grand day.

24   Q    And you had worked there for about two years, right?

25   A    I think it was a year-and-a-half.
```

1    Q    Okay.

2    A    A little less.

3    Q    Okay.  So a few times he said that to you, and like you

4    were asked earlier by Ms. Panagakos, there were employees of

5    the Ministry, yes?

6    A    There were, yes.

7    Q    And you guys were paid, right?

8    A    We were, yes.

9    Q    To your knowledge, there was rent that was paid, right?

10   A    Yes.

11   Q    So you in your knowledge of the Ministry understood that

12   the Ministry, to operate it, there was some overhead involved,

13   yes?

14   A    That's my understanding, yes.

15            MR. OTAKE:  All right.  Thank you, Ms. Walsh.

16            THE WITNESS:  You're welcome.

17            MR. OTAKE:  Nothing further.

18            THE COURT:  Ms. Panagakos?

19     RECROSS EXAMINATION BY COUNSEL FOR DEFENDANT S. CHRISTIE

20   BY MS. PANAGAKOS:

21   Q    Mr. Kawahara asked you about the suppliers to the

22   Ministry.  Do you recall testifying about that in your grand

23   jury testimony?

24   A    If you could point it out.

25   Q    It was Roger who asked you to leave the Ministry when

1    distributors came, correct?

2    A    It was, yes.

3    Q    And sometimes you saw the people who were coming in those

4    meetings, right?

5    A    Sometimes I did, yes.

6    Q    And you never saw Susanne Friend or Timothy Mann come for

7    that purpose?

8    A    I don't recall ever seeing Timothy Mann.  Susanne Friend,

9    I might have seen coming from --

10   Q    Right.  It was your experience that she came to deliver

11   aloha bags, correct?

12   A    Yes.

13   Q    And during your grand jury testimony, you never testified

14   about Share asking you to leave while there was any secret

15   meeting with a distributor?

16   A    I didn't, no.

17   Q    And it was Roger who set the donation prices, correct?

18   A    It was, yes.

19   Q    And Roger, I believe you testified in your grand jury

20   testimony, he met almost every single person who became a

21   member, correct?

22   A    That's not my experience, no.  Can I add to that?

23   Q    The members that were on Hilo came in for orientation and

24   he met them, correct?

25   A    The members that were on Hilo came in to orientation.

1    There were some members, prospective members, that came in

2    outside of orientation.  They would become members.  It would

3    be preferred if they ended up attending an orientation, but I

4    don't know that they always did.  And so I can't say with

5    certainty from my experience that Roger met every member before

6    they became a member.

7    Q    He usually met almost every person as long as they were in

8    Hawaii; is that correct?

9         MR. KAWAHARA:  Objection.  To the extent she knows,

10   Your Honor.

11        THE COURT:  Yes.  To the extent you know, based on

12   your knowledge.  So it's overruled.

13        THE WITNESS:  Yes.

14   BY MS. PANAGAKOS:

15   Q    You see your grand jury testimony here, line 16, 17, and

16   he usually met almost every person as long as they were in

17   Hawaii, correct?

18   A    It says that, yes.

19        MS. PANAGAKOS:  Thank you, Your Honor.

20        MR. KAWAHARA:  No further questions, Your Honor.

21        THE COURT:  All right.  Thank you very much.  You're

22   excused as a witness.  Please do not discuss your testimony

23   with anyone until after the Court makes a decision whether to

24   grant or deny the motion.

25        All right.  Thank you very much.  You're excused.

1    Call your next witness.  Actually, we should take a recess.  So

2    we'll take a recess, and how about 20-minute recess?  And so

3    we'll reconvene at 10:40.  All right.  Thank you very much.

4              (Whereupon, a short recess was taken.)

5              THE COURT:  All right.  The record will reflect the

6    presence of counsel and Mr. Christie and Mrs. Christie.  You

7    may be seated.

8              All right.  Your next witness, Mr. Kawahara.

9              MR. KAWAHARA:  The next witness is on the witness

10   stand, Your Honor, Victoria Fiore, F-I-O-R-E.

11             THE COURT:  Thank you very much.  Please administer

12   the oath.

13             (Witness sworn.)

14             THE CLERK:  Please state your name and spell your last

15   name for the record.

16             THE WITNESS:  Victoria Fiore, F, as in Frank, I-O-R-E.

17             MR. KAWAHARA:  I have no questions for her for direct

18   examination.  Her declaration has already been filed with this

19   court.

20             THE COURT:  Thank you.  Mr. Otake.

21     CROSS EXAMINATION BY COUNSEL FOR DEFENDANT R. CHRISTIE

22   BY MR. OTAKE:

23   Q    Good morning, Ms. Fiore.

24   A    Good morning.

25   Q    Is that how you say your last name, Fiore?

1   A     Yeah.

2   Q     I have some questions for you this morning, not a whole

3   lot, but if there's a question I ask that you don't understand,

4   let me know and I'll rephrase it, okay?

5   A     Okay.

6   Q     Now from your declaration that you signed related to this

7   case, it appears that you only worked at the THC Ministry for

8   about two months; is that right?

9   A     Correct.

10  Q     Do you remember the dates, I mean the months?

11  A     It was about the second week of April to about the third

12  week of June 2009.

13  Q     Okay.  Speaking of this declaration, what was the process

14  that led to this declaration being signed?  In other words, did

15  you draft it?  Who drafted the declaration to your knowledge?

16  A     I would imagine the prosecuting attorney would be drafting

17  the declaration.

18  Q     All right.  So he drafted it, you reviewed it, and then

19  you signed it, right?

20  A     Correct.

21  Q     All right.  In this case you were also charged, right?

22  A     Yes.

23  Q     And then you understood that there was a possibility of a

24  five-year mandatory minimum, yes?

25  A     Correct.

1    Q    And you understood that the prosecutor who was drafting

2    this declaration was the one that would have an input on what

3    would happen in your case, yes?

4    A    Correct.

5    Q    All right.  Now, how did you learn about the THC Ministry

6    first?  How did you first learn of it?

7    A    A banner on Bay -- or on Kamehameha Avenue by Nui Nui,

8    their office had a huge banner hanging right outside of it.

9    Q    Okay.  So you happened to be passing by in Hilo one day

10   and you saw the banner, yes?

11   A    Correct.

12   Q    And it is the banner that said something along the lines

13   of, the THC Ministry, we use cannabis religiously and you can

14   too?

15   A    Correct.

16   Q    All right.  Following seeing that banner, at some point

17   you went and tried to learn more about the Ministry, correct?

18   A    Yes.

19   Q    Although you only worked there for a couple of months, in

20   your experience, the Ministry operated in a fairly nonsecretive

21   way, yes?

22   A    Absolutely.

23   Q    In addition to the banner, for example, there were

24   newspaper advertisements done, yes?

25   A    Yes.

1   Q    And there was even a web site that you knew of, right?

2   A    Yes.

3   Q    All right.  You talked about when there were people there

4   to receive sacrament, that there were times when sometimes the

5   line would kind of be out the door; is that right?

6   A    Correct.

7   Q    On to the sidewalk in public view, yes?

8   A    Correct.

9   Q    So from your interactions with Roger and what you saw and

10  what you observed, it didn't appear to you that he was trying

11  to conceal his activities from the public --

12  A    Correct.

13  Q    -- is that safe to say?

14  A    Yeah.

15  Q    All right.  Now, one of the first things you had to do, I

16  guess, as part of becoming a member and working there was go

17  through an orientation, yes?

18  A    Yes.

19  Q    At this orientation, you mentioned in your declaration

20  that there was maybe six or seven other people, right?

21  A    Correct.

22  Q    And obviously Roger was there too, yes?

23  A    Correct.

24  Q    He had the opportunity to interact with you and the other

25  people, yes?

1   A      Yes.

2   Q      And he explained to you the beliefs of the Ministry,

3   right?

4   A      Correct.

5   Q      He also had an opportunity to answer any questions if

6   anybody had questions; is that right?

7   A      Right.

8   Q      And among other things, he told you that the Ministry and

9   the use of cannabis as a sacrament was legal so long as you

10  were sincere in using it for religious purposes, right?

11  A      Correct.

12  Q      So at least to your understanding, to the people that were

13  appearing in person to become members, Roger would interact

14  with every one of them, right?

15  A      Correct.

16  Q      Do you recall hearing Roger from time to time, whether it

17  was to you or others and you were there that you could hear, do

18  you recall him indicating to people that the cannabis for

19  religious use should be used at home, at church, or in nature?

20  A      Correct.  I've heard that.

21  Q      With regards to the sharing of what was referred to as

22  sacrament, isn't it true that you were instructed by Roger that

23  only ministry members or those with medical marijuana cards

24  could obtain sacrament?

25  A      Yes.  That is correct.

1    Q    And to your knowledge, it was Roger who made the decision

2    of who would be a member, not you, right?

3    A    Yes.

4    Q    There's been this talk about this Express practice dealing

5    with sharing sacrament with members and as far as when that

6    would take place.  In your experience, it was three days a week

7    for about three hours each day; is that right?

8    A    Correct.

9    Q    And that's what you're talking about, about where people

10   had to show their membership card or their medical marijuana

11   card, yes?

12   A    Yes.

13   Q    Now, just to be clear, when you were working during these

14   times, you would be inside the Ministry; is that right?

15   A    Yes.

16   Q    But at times there was also a doorman, yes?

17   A    Yes.

18   Q    And the doorman also, to your knowledge, would be checking

19   for membership cards; is that right?

20   A    Right.

21   Q    In addition to having to have that form of membership card

22   or medical marijuana card, one of the things that people were

23   required to do when they came in was to wash their hands with

24   hemp soap, right?

25   A    Right.

1    Q     And your understanding was that was to some degree a

2    symbolic act to reinforce that they were there for this

3    religious purpose, right?

4    A     Correct.

5    Q     It was also important and required by Roger, to your

6    knowledge, that the people who were there to receive sacrament

7    were respectful and demonstrated good manners?

8    A     Yes.

9    Q     Would you agree with me -- well, let me rephrase that.

10   Would you agree with the statement that most of the people that

11   came through this Express procedure would be making a donation

12   in the range of $20 to $50, the majority of people?

13   A     That would be the average, the majority, yes.

14   Q     Okay.  Now, one of the things in the declaration drafted

15   by Mr. Kawahara that you adopted, one of the things in the

16   declaration is that you never advised members of any

17   restrictions on what they could do with the sacrament; is that

18   right?

19   A     Correct.

20   Q     Aside from your orientation, you weren't there though at

21   all of the orientations Roger was doing during this time

22   period, were you?

23   A     Not all of them, no.

24   Q     Okay.  You talk about the Sanctuary Kit in your

25   declaration.  You're familiar with what that is, yes?

1   A    Yes.

2   Q    And it's true that the Sanctuary Kits that were mailed out

3   were mostly mailed to people outside of Hilo, yes?

4   A    Yes.

5   Q    And was it your assumption then that because -- well, for

6   example, that they were mailed to the mainland, yes --

7   A    Yes.

8   Q    -- right?  And mailed to other islands, right?

9   A    Yes.

10  Q    And was it your assumption then that for the most part the

11  people you were mailing the Sanctuary Kits to were not regular

12  participants in the Express procedure at the Hilo office?

13  A    Correct.

14  Q    Okay.  The Sanctuary Kits, the contents of it, there were

15  plant tags, yes?

16  A    Yes.

17  Q    Not actual live plants, but plant tags, right?

18  A    Plant tags.

19  Q    There were bag tags, yes?

20  A    Correct.

21  Q    There was a certificate of some sort, yes?

22  A    Yes.

23  Q    And I want to ask you specifically about this holy

24  anointing oil, and you remember that a small bottle of that

25  would also be in the kit as well, yes?

```
 1   A     Correct.

 2   Q     Were you familiar with what was -- what the ingredients of

 3   the holy anointing oil was?

 4   A     Yes.

 5   Q     What were the ingredients to your knowledge?

 6   A     To my knowledge, there was sacrament or marijuana --

 7   Q     Okay.

 8   A     -- that was infused in a blend of oils.

 9   Q     Okay.

10   A     I'm not sure what the process was or exactly what oils

11   those were.

12   Q     So there was some sacrament infused into oils, yes?

13   A     Correct.

14   Q     What was your understanding of what the purpose of the

15   holy anointing oil was as you were --

16   A     From what I understood, it was a replication of what

17   was -- what was in the Bible as far as holy anointing oil, and

18   I believe it was referenced to Moses.

19   Q     Okay.  But the purpose of when it was sent out to people

20   who were obtaining the Sanctuary Kit or even within any other

21   members, what is your understanding of what the purpose of that

22   oil was for?

23   A     The purpose of that oil, from my understanding, was used

24   for kind of like a personal blessing or a blessing --

25   Q     Okay.
```

1  A     -- that they would give unto other people to use it --

2  Q     So you --

3  A     -- as a prayer, I would suppose.

4  Q     So your understanding is it had a somewhat symbolic or

5  religious purpose in issuing a blessing or a prayer?

6  A     Right.  There was a religious connotation to it.

7  Q     Okay.  As far as your time working there, were you aware

8  of a farm being run by people with the last names Friend and

9  Mann?

10  A     I had heard -- I had heard that there was one, yes.

11  Q     Did you know --

12  A     I didn't know who they were per se or where that was

13  located.

14  Q     Okay.  Did you have any idea how many plants were being

15  grown at that farm?

16  A     No.

17  Q     Excuse me?

18  A     No.

19  Q     Okay.  Now you -- as part of your efforts to resolve this

20  case, you pled out or you pled guilty to being part of a

21  conspiracy to distribute marijuana, yes?

22  A     Yes.

23  Q     And that included -- well, let me rephrase that.  The

24  charge indicated that it was a conspiracy to distribute

25  marijuana and that it involved more than a hundred plants; is

1   that right?

2   A    Correct.

3   Q    But you had no idea how many plants --

4        MR. KAWAHARA:  Objection, Your Honor.  That calls for

5   a legal conclusion on her part.

6        MR. OTAKE:  How many plants are at the farm --

7        THE COURT:  Overruled.

8   BY MR. OTAKE:

9   Q    You had no idea how many plants were at the farm, did you?

10  A    I had no idea how many they were growing, no.

11  Q    But obviously you were scared when you heard there was

12  this five-year mandatory minimum, yeah?

13  A    Obviously, anybody would be concerned if they heard that.

14  Q    Sure.  Sure.  Okay.  And you, after receiving advice from

15  counsel, decided the best way for you to avoid that was to go

16  this route that you've gone, yes?

17  A    Correct.

18  Q    Now, I know you were only there about two months, but

19  during your two months of being there, do you ever recall a

20  time when anyone that, to your knowledge, was from any -- any

21  type of law enforcement agency came by the Ministry?

22  A    Yes.

23  Q    Okay.  And who was that?

24  A    A local Hilo police officer.

25  Q    And what was his name?

1   A    I don't know what his name was.

2   Q    And he came by the Ministry?

3   A    Yes.

4   Q    And did he have a chance to talk to Roger?

5   A    Yep.

6   Q    Okay.  Now -- and that was someone from the Hawaii County

7   Police Department to your knowledge?

8   A    To my knowledge, yeah.

9   Q    Now I don't want to get into what he said, but did Roger

10  appear willing to talk to him?

11  A    Yes.

12  Q    And this took place at the Ministry?

13  A    At the Ministry, yes.

14  Q    So obviously this person from law enforcement knew of the

15  Ministry, right?

16  A    Correct.

17  Q    And Roger was willing to engage in a conversation with him

18  that you saw?

19  A    Yes.

20  Q    All right.

21          MR. OTAKE:  Thank you.  No further questions.

22          THE COURT:  Ms. Panagakos, your witness.

23      CROSS EXAMINATION BY COUNSEL FOR DEFENDANT S. CHRISTIE

24  BY MS. PANAGAKOS:

25  Q    So you testified before the grand jury in -- a few years

1    ago, in August of 2010; is that correct?

2    A    That, I'm sorry, I didn't hear the last part.

3    Q    Do you recall testifying before the grand jury in this

4    case a few years ago?

5    A    Yes.

6    Q    And also being interviewed by a DEA agent?

7    A    Correct.

8    Q    And at -- on those occasions, you testified that Share's

9    role in Express was to fill in when Roger was not available,

10   correct?

11   A    Correct.

12   Q    Were you familiar with the Ministry web site?

13   A    Yes.

14   Q    And this is what was filed as document 613-1, which is an

15   excerpt of the web site.  The web site emphasized the

16   importance of sincerity, correct?

17   A    Correct.

18   Q    And this ministry offers cannabis to sincere

19   practitioners, correct?

20   A    Correct.

21   Q    And Roger had actually told you that if -- that that was

22   important for your participation was your sincerity, correct?

23   A    Correct.

24   Q    And he also emphasized that good manners and respect for

25   others was a practice of this ministry?

1   A     Yes.

2   Q     And this page of the excerpt lists five things, sincerity,

3   legitimacy, a mandate to grow and use cannabis, sacrament must

4   be used in private, preferably at home or church, and sale of

5   sacrament is not permitted.

6         Do you see that?

7   A     Yes.

8   Q     And were these the tenets of the Ministry as far as

9   members?

10  A     As far as I understand, yes.

11        MS. PANAGAKOS:  I have nothing further, Your Honor.

12        THE COURT:  Thank you.

13        MR. KAWAHARA:  No redirect, Your Honor.

14        THE COURT:  No redirect, is that what you said?

15        MR. KAWAHARA:  That's correct, Your Honor.

16        THE COURT:  All right.  Then thank you very much, Ms.

17  Fiore.  I'm excusing you as a witness.  Please don't discuss

18  your testimony with anyone until after I make a ruling whether

19  to grant or deny the motion.  Thank you and good day.

20        THE WITNESS:  Thank you very much.

21        MR. KAWAHARA:  Next witness, Your Honor, is -- oh,

22  might as well do exhibits now.

23        MR. OTAKE:  Your Honor, before we forget, just really

24  quickly, not really in regards to Ms. Fiore.  Thank you, Ms.

25  Fiore.

1              There's some exhibits that we wanted to stipulate in,

2      and we thought this might be a good time.

3              THE COURT:  Very well.  Good idea.

4              MR. KAWAHARA:  It's a stipulation concerning exhibits

5      on both sides that are on our exhibit lists, Your Honor, and

6      have been tendered to the Court.

7              MS. PANAGAKOS:  Yes, Your Honor.  Specifically about

8      Exhibits A through O, the defense exhibits, those are plants

9      that were seized from the Mann/Friend farm and are part of the

10     plants that comprise the 284 plants at issue in the charges in

11     the indictment.  And I believe Mr. Kawahara would agree with

12     that.

13             MR. KAWAHARA:  Yes, Your Honor.  And also I believe

14     the defense is stipulating to the exhibits that we have

15     identified in our exhibit list and provided to the Court, as

16     well as the Sze exhibits that we tendered yesterday.

17             THE COURT:  All right.  Thank you very much.  So the

18     Court is going to receive in evidence then by stipulation

19     Defendants Roger and Sherryanne Christie's Joint Exhibits A

20     through O, that is more fully described and attached to the

21     filing filed on August 26th, 2013.  And government's exhibits

22     as identified in their submission and filing -- is that the one

23     of August 22?

24             MR. KAWAHARA:  Yes, Your Honor.

25             THE COURT:  Okay.  August 22, 2013.  So all of those

1    exhibits are received by stipulation.

2             MR. KAWAHARA:  As well as, Your Honor, yesterday I

3    submitted what is called Sze exhibits -- pardon me, Sze

4    Exhibits 5 through 9, those would also be part of the

5    stipulation.

6             THE COURT:  All right.  Is that correct from defense

7    counsel, do you agree?

8             MR. OTAKE:  Yes.

9             THE COURT:  All right.  I'm not trying to force you to

10   it.  I just wanted to make sure we have confirmation on the

11   record before I receive it in evidence via stipulation.  So

12   that is via stipulation, those are received as well.

13            Anything else we need to do for housekeeping before we

14   take the next witness?

15            MR. OTAKE:  Yes, Your Honor.  With regards to the

16   declaration of Edwin Buyten, I am asking that at the very least

17   the last sentence of the August 5th, 2013 declaration be

18   stricken as it is simply -- it's just hearsay.  And there would

19   be no basis.

20            MR. KAWAHARA:  How would you know that?

21            THE COURT:  Wait, wait.

22            MR. OTAKE:  Because I read it and it's talking

23   about --

24            THE COURT:  So this is what we're going to do is, I

25   can take that up and rule on that after we have the witness.

1          MR. OTAKE:  That's fine.  I just wanted to remember to

2     put that on the record.  It doesn't have to do with what I'm

3     going to be asking him, but I wasn't sure if you wanted me to

4     do that now or later because we have other arguments, you know,

5     as to -- well, that's fine.

6          THE COURT:  Okay.

7          MS. PANAGAKOS:  And, Your Honor, can I just be deemed

8     to join in all of Mr. Otake's objections unless I say

9     otherwise?

10          THE COURT:  Yes.  Any objection in that, Mr. Kawahara?

11     Whatever defense counsel makes an objection in the hearing, the

12     other is going to be deemed to have joined.

13          MR. KAWAHARA:  Yes, that's fine.

14          THE COURT:  So we'll take that up after he's called.

15          MR. OTAKE:  That's fine.

16          THE COURT:  All right.

17          MR. OTAKE:  I just wanted to remember to do it.

18          THE COURT:  Okay.  Thank you.  All right.  So Mr.

19     Kawahara, I think your --

20          MR. KAWAHARA:  Next witness, Your Honor, is a Hawaii

21     County Police Department officer, Detective Edwin A. Buyten.

22          (Witness sworn.)

23          THE CLERK:  Please state your name and spell your last

24     name for the record.

25          THE WITNESS:  My name is Edwin Buyten.  That's spelled

1    like B, like boy, U-Y-T-E-N.

2         THE COURT:  Thank you very much.  Mr. Otake, we'll

3    begin with your cross examination.

4         CROSS EXAMINATION BY COUNSEL FOR DEFENDANT R. CHRISTIE

5    BY MR. OTAKE:

6    Q    Thank you.  Sir, what is your current rank in Hawaii

7    County?

8    A    My current rank is Sergeant Detective.

9    Q    Okay.  I only ask because do most people call you

10   detective or sergeant?

11   A    It's odd in the police department.  You can call me

12   detective.  I go by detective.

13   Q    All right.  Detective Buyten, you've been with the Hawaii

14   County Police Department since 2002, yes?

15   A    Correct.

16   Q    And you've been in the vice, I guess, squad of the Kona

17   division since 2006; is that right?

18   A    Yes.

19   Q    Since you started in 2002 -- well, when you started in

20   2002, were you also assigned to the Kona side of the island?

21   A    Yes.  We refer to it as area two.

22   Q    Kona is area two?

23   A    Correct.

24   Q    What is Hilo called?

25   A    Area one.

1   Q    Okay.  So you've always been assigned to area two since

2   you started with the Hawaii County Police Department; is that

3   right?

4   A    Not always.  I was assigned generally to the Big Island

5   during a stint in intelligence, which covers the whole island.

6   Q    Okay.  But since 2006, you were assigned to the Kona vice

7   division, yes?

8   A    Correct.

9   Q    So the island is basically, as far as the Hawaii County

10  Police Department is concerned, there's area one and area two;

11  is that right?

12  A    Correct.

13  Q    Did you ever work specifically in the Hilo division or I

14  guess what would be area one, in other words, were you ever

15  assigned specifically to that Hilo area?

16  A    To answer that question, so I can make it clear, when I

17  was in criminal intelligence, I worked both Kona and Hilo, the

18  entire island.

19  Q    Okay.  But were you ever assigned just specifically to

20  Hilo?

21  A    Not specifically to Hilo, no.

22  Q    So, for example, since 2006 you were specifically assigned

23  to the Kona vice, yes?

24  A    Yes.

25  Q    Okay.

1    A    But I'd have to elaborate a little bit more on that so I

2    could make it clear one more time that from 2006 to 2011, I was

3    assigned to criminal intelligence which covered both Hilo and

4    Kona, the entire island.

5    Q    Okay.  So from 2006 to 2011 you were only in Kona though,

6    right?

7    A    I was assigned to Kona, but I did work in Hilo.

8    Q    All right.  Not trying to trick you.  You were only

9    assigned to Kona, yes?

10   A    Yes.

11   Q    From 2006 to 2011?

12   A    Correct.

13   Q    All right.  Now, to your knowledge the THC Ministry was

14   located in downtown Hilo, yes?

15   A    Yes.

16   Q    Are you aware throughout the course of your employment

17   that the THC Ministry would regularly place ads in the paper,

18   Sunday paper and whatnot, about their existence?

19   A    I can't say I ever saw any of those ads.

20   Q    Okay.  Were you aware that there was a large banner

21   hanging outside of the THC Ministry that indicated "we use

22   cannabis religiously, you can too"?

23   A    I've seen the banner before on the news or maybe in the

24   newspaper.

25   Q    Okay.

1   A     I'm only familiar with the THC Ministry part.

2   Q     Only familiar with, excuse me?

3   A     When you're referring to the banner.

4   Q     Yeah.

5   A     I've seen pictures of the banner before.

6   Q     Okay.  But did you ever have the opportunity to see it as

7   it was hanging outside the window in downtown Hilo?

8   A     No.

9   Q     Have you ever been to the Ministry?

10  A     No.

11  Q     Did you ever drive by the Ministry prior to it being shut

12  down?

13  A     No.

14  Q     Are you aware that the Ministry had a web site?

15  A     Yes, I am aware they had a web site.

16  Q     Are you aware that the Ministry would advertise seminars

17  that they would be putting on in a variety of publications

18  throughout the Big Island?

19  A     I'm not aware of those seminars, no.

20  Q     In your training and experience, including your time in

21  the Kona vice, would you agree that the use of a banner, the

22  use of a web site, the use of newspaper advertisements, in your

23  training and experiences that doesn't demonstrate a desire to

24  conceal one's activities, yes?

25          MR. KAWAHARA:  Objection, Your Honor.  That calls for

1    speculation on the part of this witness.

2            THE COURT:  Overruled.  This is his area of

3    experience.

4            MR. OTAKE:  Right.

5            THE WITNESS:  In my experience, I've conducted a lot

6    of different investigations where people have used web sites,

7    Craigslist, articles in the newspaper, to sell other items that

8    wasn't exactly what they were proclaiming to be.

9    BY MR. OTAKE:

10   Q    Okay.  So when the THC Ministry hung out a banner that

11   said, "we use cannabis religiously, you can too," you would

12   agree that that is not indicative of someone trying to conceal

13   the fact that they're using cannabis religiously, correct?

14   A    I feel that, yeah, it's a pretty open statement.

15   Q    All right.  You mentioned in your declaration that you saw

16   plant tags in about 20 different investigations, yes?

17   A    Yes.

18   Q    And you saw bag tags in about 25 to 50 different

19   investigations, yes?

20   A    Yes.

21   Q    And in your declaration, the second one that Mr. Kawahara

22   had you do later, you mentioned two of these so-called 50

23   investigations by name, correct?

24   A    Correct.

25   Q    You didn't name the other 48, right?

1   A      No, sir.

2   Q      You say you saw plant tags on cannabis plants in these

3   different investigations, right?

4   A      Correct.

5   Q      Now, although you can say what the plant tags had on them,

6   you cannot say where the plants came from, can you, in terms of

7   your personal knowledge of what you observed?

8   A      No.

9   Q      Okay.  To your knowledge, throughout the course of your

10  employment, does it violate Hawaii County law to be in

11  possession of a plastic plant tag?

12  A      To be in possession of a plant tag, no.

13  Q      Okay.  Does it violate county law to distribute a plastic

14  plant tag?

15  A      The plant tag itself, no.

16  Q      Now, you talked about these bags that you saw, plant bags

17  labeled with ministry stickers, yes?

18  A      Correct.

19  Q      And again, as far as from your observation of the bag, you

20  can make certain assumptions -- well, let me rephrase that.

21          As far as your observations of the bag, you cannot say

22  that the actual cannabis in the bag came from the THC Ministry,

23  can you?

24  A      No, I cannot.

25  Q      In the course of your employment, are you aware that the

1    Hawaii County Council, sometime in 2008, around that time

2    period, passed something called The Lowest Law Enforcement

3    Priority of Cannabis ordinance?

4    A    I'm generally familiar with it, yes.

5    Q    All right.  When you say you saw these plant tags and

6    plant bags in up to 50 investigations, did you notify other law

7    enforcement people on the Big Island of your concerns?

8    A    In those situations being assigned to vice narcotics for

9    eight years, I've assisted in a lot of investigations.  Mostly

10   those investigations were led by other investigators in other

11   agencies, so they were aware of it, would be my answer to that

12   question.

13   Q    Did you notify other people in law enforcement within your

14   department of your concerns when you saw these plant tags and

15   bags in up to 50 investigations?

16   A    Again, those parties would have been present at the same

17   time as me in assisting them, so they were aware of the

18   situation.

19   Q    What's your rank right now, again?

20   A    My rank now is sergeant or detective.

21   Q    Who do you report to?  Who's above you in the --

22   A    A lieutenant.

23   Q    Who's above the lieutenant?

24   A    A captain.

25   Q    Who's above the captain?

1    A    A major.

2    Q    And then from the major it goes to where?

3    A    Assistant chief.

4    Q    And then to the chief?

5    A    Deputy chief.

6    Q    Okay.  Did you ever make your concerns known up the chain

7    of command up to any major, yes or no?

8    A    Well, sir, I can't answer that yes or no because at the

9    time I would have been an officer.  So there would have been a

10   sergeant or a detective and/or a lieutenant on the scene who's

11   aware of the situation.  So, yes, they're aware of it because I

12   was an officer assisting in the investigations.

13   Q    Okay.  So did you ever follow up and see if concerns over

14   these plant tags was conveyed up the chain of command within

15   the Hawaii County department?

16   A    No.  I wouldn't have followed up with it.

17   Q    All right.  To your knowledge did you or anyone from your

18   department ever set up a meeting with Roger Christie to discuss

19   these concerns you say you had?

20   A    I wouldn't be aware of any meeting.

21   Q    Did you or anyone from your department ever suggest to the

22   Ministry ways that it could improve their operation from a law

23   enforcement standpoint?

24   A    I can only speak for myself, and I would say not me.

25   Q    And you're not aware of anybody else doing that --

```
 1   A    No, sir.

 2   Q    -- within the department?

 3   A    No.

 4   Q    Prior to the federal government indicting Mr. Christie

 5   with federal crimes, are you aware of anything that you or your

 6   department did to explore other means of curbing some of the

 7   activities that concerned you?

 8   A    I'm not aware of anything that the department would have

 9   done.  I can only speak to the investigations that I was part

10   of.

11   Q    And you did nothing to approach Mr. Christie or his

12   ministry to express concerns that you had, right?

13   A    Not me directly, sir, no.

14        MR. OTAKE:  All right.  No further questions -- hold

15   on, I'm sorry, Your Honor.

16        MS. PANAGAKOS:  May we confer?

17        THE COURT:  Yes.  You may.

18        MR. OTAKE:  No further questions.

19        THE COURT:  All right.  Thank you.  Ms. Panagakos,

20   your witness.

21      CROSS EXAMINATION BY COUNSEL FOR DEFENDANT S. CHRISTIE

22   BY MS. PANAGAKOS:

23   Q    Hi, Detective.

24   A    Good morning.

25   Q    So do you know a sergeant nicknamed Bully?
```

```
 1   A      I'm sorry.

 2   Q      A Hawaii County police sergeant nicknamed Bully?

 3   A      Bully?

 4   Q      Yeah.

 5   A      I can't say that I know a Bully.

 6   Q      So you're not aware that he visited the Ministry and told

 7   them that the religious use was okay?

 8   A      No, ma'am.

 9   Q      And you're not aware of members of the vice squad visiting

10   the Ministry?

11   A      I am not, no.

12   Q      I assume -- are you aware that Mr. Christie made annual

13   visits to the police chief?

14   A      I'm not aware of that, no.

15   Q      Are you aware that he had annual meetings with the mayor?

16   A      I did not know that, no.

17   Q      Are you aware that Mr. Christie spoke directly with

18   Community Police Officer William Derr too?

19   A      No, ma'am.

20   Q      Are you aware that Mr. Christie spoke regularly at the

21   Hawaii County Council?

22   A      I know he was involved in politics, but not directly to

23   the county council, no.

24   Q      And when you say you know he was involved in politics, he

25   was open about his ministry in connection with those political
```

```
 1   activities?

 2   A    I think I remember an article that he actually ran for

 3   politics one time, on the Big Island is what I'm referring to.

 4   Q    And do you recall when that was?

 5   A    Over five years ago maybe.

 6   Q    But sometime after 2000?

 7   A    Yeah.

 8   Q    So while he was operating the Ministry?

 9   A    If it's the same time, yes.

10   Q    Are you aware that he spoke regularly to the Hawaii County

11   Police Commission?

12   A    No.

13   Q    Are you aware that Hawaii County has rules permitting

14   religious use signed by Police Chief James Correa and Mayor

15   Kim?

16   A    Religious use of marijuana?

17   Q    Yeah.

18   A    I'm not aware of that, no.

19        MS. PANAGAKOS:  Nothing further, Your Honor.

20        MR. KAWAHARA:  No redirect, Your Honor.

21        THE COURT:  All right.  Thank you very much.

22        THE WITNESS:  Thank you, Your Honor.

23        THE COURT:  You're excused as a witness.  Please don't

24   discuss your testimony with anyone until I make a ruling on

25   this motion.
```

1           THE WITNESS:  I understand.

2           THE COURT:  All right.  Good day to you.

3           MR. KAWAHARA:  That concludes my evidence

4    presentation, Your Honor.

5           THE COURT:  All right.  So you wanted to address the

6    hearsay?

7           MR. OTAKE:  Yeah.  So, thank you, Your Honor.  So when

8    you look at what was his first declaration, the first

9    declaration of Edwin Buyten, page three.  The declaration dated

10   August 5th, 2013.  The last sentence says, "Furthermore, in

11   many instances the persons in possession of said marked plastic

12   bags did not claim to be members of the THC Ministry."

13          I'd ask that that be stricken and not considered by

14   Your Honor.  It is clearly a hearsay statement being offered

15   for the truth.

16          THE COURT:  Mr. Kawahara, did you want to argue this

17   point?

18          MR. KAWAHARA:  The issue, Your Honor, here is that

19   what the -- what individuals told the police officer, I think,

20   is relevant in terms of what possible relationship there was to

21   those particular tags.  And I think it is important that not

22   everyone says whether they're a member or not and that is

23   important in terms of what -- in terms of the interest that

24   the -- that the United States, that prosecution authorities

25   have, is that people do not claim to have membership at times.

1    And that has a bearing, whether they're a member or not, that

2    still has a bearing on whether or not there is a compelling

3    interest.  So the fact that people say things one or the

4    other --

5            MR. OTAKE:  Right.

6            MR. KAWAHARA:  -- it does bear on how the United

7    States or how prosecution authorities should view it in terms

8    of their own interest.  And I think that's the full purpose of

9    it, Your Honor.

10           MR. OTAKE:  Well, and that's why, my objection wasn't

11   relevance.  It clearly would be relevant if those people were

12   here to say it, but my objection is hearsay because they're not

13   here.

14           THE COURT:  So the objection is overruled because what

15   he's doing is he's giving his conclusion as part of his

16   investigation.

17           MR. OTAKE:  Okay.  But it's not being considered for

18   the truth.

19           THE COURT:  Right.

20           MR. OTAKE:  That isn't what these people said.

21           THE COURT:  Exactly.  And just like any police

22   investigation, police officers can interview witnesses and then

23   come up with a conclusion, making a recommendation to the

24   prosecutor, for instance, that there's sufficient evidence for

25   charges to be brought.  They may be wrong.  They may be

1    mistaken, and that's why the prosecutor needs to review it.

2             MR. OTAKE:  But I just want to be clear, I mean what

3    he's writing is not his conclusion.  What he's writing is what

4    he's saying these people said.  And so --

5             THE COURT:  As part of his investigation, he can rely

6    on hearsay, and that's what he's saying, you know, for his

7    conclusion for the -- his investigation.  So it's not being

8    offered for the truth of the matter asserted.  It's saying he's

9    doing this investigation and he gathers all of this information

10   and this is what his assessment is.  And police officers can do

11   that.  Law enforcement officers can do that.

12            MR. OTAKE:  Surely they can do that, Your Honor, but

13   I'm objecting, as the Court understands, to this statement

14   being used in any substantive way as it relates to the issue of

15   diversion that the Court is deciding today.

16            Because these people aren't here, and we've never had

17   a chance to confront them.  It's simply him making a statement

18   of what was said to him.  And so, I mean, if the Court, I know,

19   you know, there's no jury here and the Court has -- I'm sure is

20   perfectly capable of piecemealing that out.  And that's all I'm

21   saying is just for the record, that that should not be

22   considered by this court at all in any substantive way as to

23   whether or not these people really had a sincere belief or not.

24            MR. KAWAHARA:  It's not a question --

25            THE COURT:  Well, it's not a question of whether they

1    had a sincere belief or not.

2            MR. KAWAHARA:  No.

3            THE COURT:  It's a question, I mean, what we're

4    focusing on is the government's burden and was the process -- I

5    mean they're particularly focusing on this Express procedure.

6    You know, was the process sufficient to address the concerns

7    raised in the Lepp decision in terms of diversion.

8            And so their argument, as I understand it, is they get

9    these blank cards that has no indication of how that you can

10   check that these people are actually the people that went to

11   orientation or what have you.  That's their argument.

12           MR. OTAKE:  Right.

13           THE COURT:  So you can have --

14           MR. OTAKE:  I'm not saying it's irrelevant, but I'm

15   objecting because it's hearsay.

16           MR. KAWAHARA:  Well, Your Honor, no, it's not hearsay

17   because the issue --

18           THE COURT:  Understood.  And so I've ruled on it.

19           MR. KAWAHARA:  Then I will say no further --

20           THE COURT:  It's overruled.  Yeah, it's overruled.  I

21   understand what your argument is, but as I'm looking at it, it

22   really pales in comparison to the rest of the testimony.  This

23   witness, quite frankly, doesn't really add all that much.  It's

24   the first two witnesses, I think, that are significant in terms

25   of the motion.  But that being said, so you rest?  I mean, you

1    don't have any --

2              MR. KAWAHARA:  Yes, Your Honor.

3              THE COURT:  Okay.  And are you folks planning to call

4    any witnesses, the defense?

5              MR. OTAKE:  Well, can we have a second, Your Honor?

6              THE COURT:  In fact, I think this would be a good time

7    to recess.  So, I don't mean to have you make that decision

8    right this second.  So why don't we take a 15-minute recess and

9    give our hard-working court reporter a few moments to catch her

10   breath, and we'll come back at quarter to.  Thank you.  We're

11   in recess.

12             (Whereupon, a short recess was taken.)

13             THE COURT:  The record will reflect the presence of

14   counsel and Mr. Christie and Mrs. Christie.  You may be seated.

15             So Mr. Otake, Ms. Panagakos, you've had an opportunity

16   to confer among yourselves and with your clients, will you be

17   calling any witnesses at this time?

18             MR. OTAKE:  After discussing the matter with my

19   client, no, we will not be.

20             THE COURT:  All right.  Ms. Panagakos.

21             MS. PANAGAKOS:  Same here.  After discussing with

22   Ms. Christie, we will not be calling any witnesses.

23             THE COURT:  All right.

24             MR. OTAKE:  However.

25             THE COURT:  Yes.

1           MR. OTAKE:  You know, one of the things we brought up

2    to Mr. Kawahara as far as how we proceed from here, given the

3    nature of this hearing and its significance, obviously, to this

4    case as a whole and the uniqueness of the law and the

5    uniqueness of the situation, Ms. Panagakos and I are requesting

6    an opportunity to submit a written argument to the Court,

7    primarily due to the testimony that came out today on cross.

8           And we want to be able to fully integrate that and the

9    new exhibits, some of which that were just filed in the last

10   day or two.  We want to fully be able to address those and

11   integrate that into our arguments.  Obviously, we came here

12   today prepared to do what, I guess, would be similar to a

13   closing argument if the Court wanted us to do that.

14          However, we really would appreciate the opportunity to

15   address this in writing, as we feel, number one, because of its

16   significance, number one, and number two, we believe that would

17   also give us a chance to, as best as possible, preserve our

18   record in the best way that we know how.  And so that's what we

19   would be asking for an opportunity to do that.

20          THE COURT:  All right.  Are you proposing -- Mr.

21   Kawahara?

22          MR. KAWAHARA:  No, Your Honor.  I would oppose that,

23   Your Honor.  I think there has been a significant amount of

24   briefing over the course of two months submitted here.

25          What came out today, what's come out in recent times

1   has not really added all that much.  I noticed yesterday that

2   defense filed a considerable amount of additional briefing

3   raising additional material, but I believe all of it can be

4   addressed.

5           As the Court pointed out to me once before about a

6   119-page memorandum in opposition I filed, I think that the

7   briefing has been rather complete in this case.  All of the

8   significant cases of importance have been pointed out to the

9   Court.  It's a matter, I think, of we've got trial coming up

10  fairly quickly.  And as this court -- I think this court has

11  tried to be very, very well-prepared such to give us a ruling

12  in advance to assist us in our trial preparation, and I think

13  that was the original notion.  I see nothing that would change

14  it.

15          I think anything that could be -- now, if defense

16  wants additional time, the Court could very well have a

17  luncheon recess and schedule oral argument for this afternoon.

18  But it seems to me that whatever needs to be covered can be

19  covered by way of oral argument at this time, and rather than

20  prolonging this particular issue, I think it's more important

21  that we have some kind of ruling such that all parties

22  understand where we go from here.

23          I'm not so sure, I can't understand what additional

24  briefing is going to permit in this particular case.

25          THE COURT:  All right.

1        MS. PANAGAKOS:  Your Honor.

2        THE COURT:  Over your objection, I'm going to permit

3   the additional briefing.  I suggest it be simultaneous, in

4   other words, basically written closing argument.  Obviously

5   there's not going to be any new things brought up or any

6   additional exhibits, it's based on what's submitted and what's

7   held in hearing.

8        Time wise, today is the 27th.  I'm not looking for,

9   you know, an extended period of time.  I would say at the most

10  a week, although we have the three-day weekend coming up, so,

11  you know, I would say the 3rd or the 4th at the latest.  This

12  Friday would be fine too, but I think that is a little short in

13  time.

14       Of course, Mr. Kawahara, you don't have to submit

15  anything if you don't want to, and I would highly encourage you

16  not to submit 119 pages.

17       MR. KAWAHARA:  I'm not thinking anywhere near that,

18  Your Honor.  I would suggest, Your Honor, it seems to me that

19  in the interest of, you know, in the interest of efficiency and

20  all that if the parties can't submit something by Friday,

21  that's rather appalling to me.

22       THE COURT:  Well, but it's difficult for them because

23  they have to run things by their clients.  If it was up to them

24  and they were just going to do something, they could probably

25  turn it around in, you know, 48 hours or so.  But I will tell

1  you, I do agree with you that a ruling on this obviously is

2  pivotal.  So what I'm going to do is within, I would say, three

3  days after I receive the briefing, I'm going to issue a outline

4  of my decision, not the reasoned order, but just so that you

5  know what the decision is, which you cannot file a motion for

6  recon on the outline, wait for my reasoned order, so that you

7  folks will know.  And you can then plan accordingly.

8            MR. OTAKE:  If I could ask --

9            THE COURT:  Yes.

10           MR. OTAKE:  -- perhaps that the written arguments be

11  due on Wednesday the 4th of September at, I don't know, 3 p.m.,

12  and then perhaps the Court's outline could come out on Friday

13  the 6th.

14           THE COURT:  Well, thanks a lot.  You're giving you

15  like over a week, and you give me less than two days.

16           MR. KAWAHARA:  Your Honor, I would suggest if the

17  briefing is to be done, let it be done by Tuesday, and that

18  will give the Court till Friday, your three days that you're

19  talking about.

20           THE COURT:  I'll let you do it the 4th.  Hopefully,

21  I'll get it out before then, but I'm going to give myself to

22  the 10th, okay.

23           MS. PANAGAKOS:  Would it be possible to get court

24  authorization to get expedited transcript of today's

25  proceeding, so I can incorporate that in the briefing?

1          THE COURT:  Yes.

2          MS. PANAGAKOS:  Because we have to do the CJA

3     paperwork.

4          THE COURT:  Right.  Good.  I'll put it on the record

5     and we'll put it in the minutes, okay, so that Cynthia will be

6     given a heads-up on that.  What else do we need to address?

7     Anything, Mr. Kawahara, from the government's standpoint?

8          MR. KAWAHARA:  So what would be the due date for

9     simultaneous briefing, Your Honor?

10         THE COURT:  That would be September 4.

11         THE CLERK:  By 3 p.m.

12         THE COURT:  3 p.m.  Oh, and make sure we get courtesy

13    copies, otherwise.

14         MS. PANAGAKOS:  All right.

15         THE COURT:  Thank you.  Have them delivered to

16    chambers, please, so that we can start looking at it right

17    away.  Mr. Otake.

18         MR. OTAKE:  Your Honor, I'll work this out with Ms.

19    Panagakos, but actually could I have one second?

20         THE COURT:  Sure.

21         MR. OTAKE:  Your Honor, we'll work it out.  We filed a

22    lot of things together in the past but.

23         THE COURT:  Yeah, I'll leave that up to you.

24         MR. OTAKE:  There's parts of this that we can do

25    together, and there's parts that we can't.  And we'll figure

1    that out.

2         THE COURT:  Understood.  Understood.  It's helpful to

3    the Court if you folks are the same on a certain position --

4         MR. OTAKE:  Right.

5         THE COURT:  -- or interpretation of the evidence that

6    rather than you file separately on that, that would be helpful,

7    and then we don't have to read it twice.

8         MR. OTAKE:  Yeah.  We'll figure out the best way to do

9    that.

10        THE COURT:  But recognizing that you have separate

11   clients with separate, you know, interests, perhaps.  I would

12   not require you to file a joint one.  Okay?  All right.  Very

13   good then.

14        MS. PANAGAKOS:  Thank you, Your Honor.

15        THE COURT:  Do you have anything else?  No?  Then,

16   Mr. Christie, you are remanded back to the custody of the U.S.

17   Marshal Service, and we are in recess.  Thank you.

18    (The proceedings concluded at 11:55 a.m., August 27, 2013.)

19

20

21

22

23

24

25

1               COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA R. OTT, Official Court Reporter, United

4    States District Court, District of Hawaii, Honolulu, Hawaii, do

5    hereby certify that the foregoing is a true, complete and

6    correct transcript of the proceedings had in connection with

7    the above-entitled matter.

8               DATED at Honolulu, Hawaii, August 28, 2013.

9

10

11                          _____*/s/ CYNTHIA R. OTT*_____
                            CYNTHIA R. OTT, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25