IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 10-00384(01) LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ROGER CUSICK CHRISTIE (01), | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANTS' MOTION IN LIMINE TO
PRESENT RELIGIOUS FREEDOM RESTORATION ACT DEFENSE**

On April 1, 2013, Defendants Roger Cusick Christie

("Christie") and Sherryanne L. Christie, formerly known as

Sherryanne L. St. Cyr ("St. Cyr", both collectively

"Defendants"), filed their joint Motion in Limine to Present

Religious Freedom Restoration Act Defense ("Motion in Limine").[1]

[Dkt. no. 587.]  Plaintiff the United States of America ("the

Government") filed its memorandum in opposition on May 20, 2013,[2]

and Defendants filed their joint reply on July 8, 2013.[3]  [Dkt.

_____

[1] Defendants filed an Errata to the Motion in Limine on
April 19, 2013.  [Dkt. no. 595.]

[2] The Government filed an Errata to its memorandum in
opposition on June 3, 2013.  [Dkt. no. 612.]  The Government also
submitted additional exhibits on June 3, 2013, [dkt. no. 613
(website excerpts); dkt. nos. 614-17 (transcripts of selected
recorded conversations),] and on July 8, 2013 [dkt. no. 640
(select photographs of "Sanctuary Kit")].

[3] Defendants filed the Supplemental Declaration of Roger
Christie on July 16, 2013.  [Dkt. no. 664.]

nos. 603, 637.]  On July 29, 2013, this Court heard oral argument
on a preliminary issue related to the Motion in Limine, and this
Court gave the parties an outline of its ruling on the
preliminary issue on July 31, 2013.[4]  After receiving additional
exhibits,[5] this Court held an evidentiary hearing on the Motion
in Limine on August 27, 2013.  Appearing on behalf of Christie
was Thomas M. Otake, Esq., appearing on behalf of St. Cyr was
Lynn E. Panagakos, Esq., and appearing on behalf of the
Government was Assistant United States Attorney Michael K.
Kawahara.  Christie and St. Cyr were also present.

        At the evidentiary hearing, this Court granted the
parties leave to file simultaneous, supplemental written
arguments.  On September 4, 2013, Defendants filed a joint
memorandum, St. Cyr filed an individual memorandum, and the
Government filed its supplemental brief.  [Dkt. nos. 694, 695,
696.]  On September 11, 2013, this Court issued an order
outlining its decision denying the Motion in Limine.  [Dkt. no.
719.]  The instant order is this Court's decision on the Motion

---

        [4] On December 30, 2013, this Court issued its written order
on the preliminary issue ("12/30/13 Order").  [Dkt. no. 810.]

        [5] After the July 31, 2013 ruling on the preliminary issue,
the Government submitted additional declarations and exhibits on
August 5, 2013, August 13, 2013, August 14, 2013, August 20, 2013
and August 26, 2013.  [Dkt. nos. 661, 667, 668, 673, 683.]  Also
on August 26, 2013, Defendants submitted additional exhibits,
[dkt. nos. 679, 681,] and a memorandum regarding the first group
of additional exhibits [dkt. no. 680].

in Limine, and this order supercedes the outline filed on
September 11, 2013.

After careful consideration of the Motion in Limine,
supporting and opposing memoranda, declarations, exhibits,
testimony, and the arguments of counsel, as more fully set forth
below, this Court HEREBY DENIES Defendants' Motion in Limine,
based on this Court's findings that: (1) the Government has
proven that it has a compelling interest in enforcing the
Controlled Substances Act, 21 U.S.C. § 801, *et seq.* ("CSA"),
against Defendants; (2) the Government has proven that the
prosecution of Defendants in the instant case is the least
restrictive means necessary to further that interest; and (3)
Defendants are therefore precluded from presenting a defense
based on the Religious Freedom Restoration Act, 42 U.S.C.
§ 2000bb, *et seq.* ("RFRA"), at trial.

## BACKGROUND

The relevant factual and procedural background is set
forth in this Court's 12/30/13 Order, which this Court
incorporates by reference.  Defendants face the following
charges:

- Count I:  knowingly and intentionally conspiring to
  manufacture, to distribute, and to possess with the intent
  to distribute marijuana, a Schedule I controlled substance,
  involving 100 or more marijuana plants, as well as harvested

3

and processed marijuana and other products containing marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846;

●   Count II:  knowingly and intentionally manufacturing marijuana, a Schedule I controlled substance, involving 100 or more marijuana plants, in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2;

●   Count III:  knowingly and intentionally possessing with the intent to distribute marijuana, a Schedule I controlled substance, involving 100 or more marijuana plants, in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2; and

●   Count XIII:  knowingly and intentionally maintaining a place, which was located in Hilo, for the purpose of manufacturing and distributing marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 856(a)(1) and 856(b).

[First Superseding Indictment, filed 1/17/13 (dkt. no. 509), at 2-5, 10.]  In addition, Christie is charged with: distributing some quantity of marijuana on May 21, 2008 (Count XIV), on June 24, 2008 (Count XV), and on August 13, 2008 (Count XVI); and failing to file a federal income tax return for the tax year 2008 (Count XVII), and for the tax year 2009 (Count XVIII).  [Id. at 10-12.]  Defendants claim RFRA as a complete defense to the

charges against them because they contend that their manufacture, distribution, and possession with the intent to distribute of marijuana are essential to their religious beliefs and practices as part of The Hawaiian Cannabis Ministry ("the THC Ministry" or "the Ministry").

In the 12/30/13 Order, this Court found that Defendants have established a prima face case for a RFRA defense.  In other words, Defendants have: 1) sufficiently articulated the scope of their beliefs regarding the use of Cannabis; 2) shown that their beliefs are religious; 3) shown that they sincerely hold these beliefs; and 4) shown that the enforcement of the CSA places a substantial burden on the exercise of their sincerely held religious beliefs.  This Court therefore ruled that the burden of persuasion has shifted to the Government to prove that it has a compelling interest in enforcing the CSA against Defendants and that the instant prosecution is the least restrictive means necessary to further that interest.

In addition to the materials that this Court considered in conjunction with the 12/30/13 Order, the Government submitted: the Declaration of Clement Sze ("Sze Declaration"),[6] with exhibits; [filed 8/5/13 (dkt. nos. 661-1);] the Declaration of

---

[6] Clement Sze is a Special Agent with the United States Drug Enforcement Administration ("DEA"), and he was involved with the investigation phase of this case from approximately 2008-2010. [Sze Decl. at ¶ 1.]

Edwin A. Buyten ("Buyten Declaration"),[7] with exhibits; [dkt. no. 661-2;] the Declaration of Jessica Walsh ("Walsh Declaration"),[8] with exhibits; [filed 8/13/13 (dkt. no. 667-1);] the Declaration of Victoria Fiore ("Fiore Declaration"),[9] with exhibits; [filed 8/14/13 (dkt. no. 668-1);] the Second Declaration of Edwin A. Buyten ("Second Buyten Declaration"), with exhibits; [filed 8/20/13 (dkt. no. 673);] and the Second Declaration of Clement Sze ("Second Sze Declaration"), with exhibits; [filed 8/26/13 (dkt. no. 683)].  The declarations served as the witnesses' testimony on direct examination for the evidentiary hearing.

Defendants' supplemental exhibits consist of articles from recent periodicals, a Department of Justice report, a memorandum from the United States Attorney General to the United

---

[7] Edwin Buyten is a police officer with the Hawai`i County Police Department ("HCPD").  He is a sergeant detective who has been assigned to the Kona Vice Division since 2006.  [Buyten Decl. at ¶ 1; Trans. of 8/27/13 Hrg., filed 8/28/13 (dkt. no. 687) ("8/27/13 Hrg. Trans."), at 82.]

[8] Jessica Walsh is one of the defendants in this case.  She pled guilty to Count I and is awaiting sentencing.  Ms. Walsh was employed by the THC Ministry from January 2009 until she quit on March 10, 2010 after a police raid on the Ministry.  [Walsh Decl. at ¶¶ 1-2.]

[9] Victoria Fiore is one of the defendants in this case.  She pled guilty to Count I and is awaiting sentencing.  Fiore was employed by the THC Ministry for approximately two months in 2009.  [Fiore Decl. at ¶¶ 1-2.]  She quit her job at the Ministry because she felt uncomfortable participating in the sale of marijuana.  [Id. at ¶ 11.]

States Attorneys and the Assistant Attorney General for the
Criminal Division, and an article by CNN's Chief Medical
Correspondent.  [Filed 8/26/13 (dkt. no. 679).]  Defendants argue
that these materials are evidence that the Government does not
have a compelling interest in enforcing the CSA against
Defendants, thereby precluding their exercise of their sincerely
held religious beliefs, because: the Attorney General has
publicly stated that the federal war on drugs has been
ineffective and that the national justice system needs to be
redirected to effectively protect the most vulnerable members of
society; and top medical professionals have recognized that
marijuana has legitimate medical applications and does not have a
high potential for abuse.  [Filed 8/26/13 (dkt. no. 680).]
Defendants also submitted various photographs of plants seized in
connection with this case.  [Filed 8/26/13 (dkt. no. 681).]

Walsh provided further direct testimony at the
August 27, 2013 evidentiary hearing.  Walsh, Fiore, and Detective
Buyten were subject to cross-examination by counsel for Christie
and counsel for St. Cyr.  This Court also received in evidence:
Exhibits 1-4 to the Sze Declaration; Exhibits 5-9 to the Second
Sze Declaration; Exhibits 1-11 to the Second Buyten Declaration;
selected transcripts of recorded telephone calls intercepted on
Target Telephone 1 ("TT1", THC Ministry's landline); selected
transcripts of recorded telephone calls intercepted on Target

Telephone 2 ("TT2", Christie's residence landline); selected
transcripts of recorded telephone calls intercepted on Target
Telephone 3 ("TT3", Christie's cellular telephone); selected
transcripts of an undercover officer's recorded conversations
with Christie; excerpts from the THC Ministry's website; select
photographs of the THC Ministry's Sanctuary Kit;[10] and
Defendants' Joint Exhibits A through O, as listed on their Joint
Exhibit List, [filed 8/21/13 (dkt. no. 675)].

This Court took the matter under advisement after the
parties filed their written closing arguments, [dkt. nos. 694,
695, 696,] and this Court issued the outline of its decision on
September 11, 2013 [dkt. no. 719].  The instant order supercedes
the September 11, 2013 outline.

## DISCUSSION

As set forth in the 12/30/13 Order, because Defendants
have presented a prima facie case under RFRA, the burden of
persuasion has shifted to the Government to prove that it has a
compelling interest in applying the statute in question to
Defendants and that its restriction on Defendants' exercise of
their religion is the least restrictive means necessary to
further that interest.  See Navajo Nation v. United States Forest
Serv., 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc).

---

[10] On August 22, 2013, the Government filed its Witness and
Exhibit List for Continued RFRA Hearing.  [Dkt. no. 677.]

I. __Compelling Interest__

In Gonzales v. O Centro Espirita Beneficente Uniao do
Vegetal, the United States Supreme Court rejected the
government's argument that the enforcement of the CSA, without
exception, is a compelling interest.  546 U.S. 418, 430-31
(2006).  The Supreme Court stated that the RFRA "contemplate[s]
an inquiry more focused than the Government's categorical
approach."  Id. at 430.  The Supreme Court emphasized that courts
must analyze the specific harm that would result from granting an
exception from the statute's application to the party in
question.  Id. at 431.  The Supreme Court stated:

> Under the more focused inquiry required by
> RFRA and the compelling interest test, the
> Government's mere invocation of the general
> characteristics of Schedule I substances, as set
> forth in the Controlled Substances Act, cannot
> carry the day.  It is true, of course, that
> Schedule I substances such as [hallucinogen
> dimethelyltryptamine ("DMT")] are exceptionally
> dangerous.  See, e.g., Touby v. United States, 500
> U.S. 160, 162, 111 S. Ct. 1752, 114 L. Ed. 2d 219
> (1991).  Nevertheless, there is no indication that
> Congress, in classifying DMT, considered the harms
> posed by the particular use at issue here-the
> circumscribed, sacramental use of hoasca by the
> [O Centro Espirita Beneficente Unia do Vegetal
> ("UDV")].  The question of the harms from the
> sacramental use of hoasca by the UDV was litigated
> below.  Before the District Court found that the
> Government had not carried its burden of showing a
> compelling interest in preventing such harms, the
> court noted that it could not "ignore that the
> legislative branch of the government elected to
> place materials containing DMT in Schedule I of
> the [CSA], reflecting findings that substances
> containing DMT have 'a high potential for abuse,'
> and 'no currently accepted medical use in

> treatment in the United States,' and that '[t]here
> is a lack of accepted safety for use of [DMT]
> under medical supervision.'"  [O Centro Espirita
> Beneficente Uniao do Vegetal v. Ashcroft,] 282 F.
> Supp. 2d, [1236,] 1254 [(D.N.M. 2002)].  But
> Congress' determination that DMT should be listed
> under Schedule I simply does not provide a
> categorical answer that relieves the Government of
> the obligation to shoulder its burden under RFRA.

Id. at 432 (some alterations in O Centro).

The Supreme Court, however, also recognized that the
government may "demonstrate a compelling interest in uniform
application of a particular program by offering evidence that
granting the requested religious accommodations would seriously
compromise its ability to administer the program."  Id. at 435.
Thus, this district court has stated:

> If Defendant's beliefs afforded him the right to
> distribute marijuana with impunity, his beliefs
> would paralyze the federal government's
> enforcement of its drug laws.  The Court is
> certain that RFRA does not compel such an outcome.
> If Congress intended to extend RFRA's reach to
> permit large-scale cultivation for distribution,
> it could easily have done so and can certainly do
> so in the future. . . .

United States v. Martines, 903 F. Supp. 2d 1061, 1066 (D. Hawai`i
2012).

This Court finds United States v. Lepp, No. CR 04-00317
MHP, 2008 WL 3843283 (N.D. Cal. Aug. 14, 2008), particularly
instructive as to the compelling interest analysis in this case.
In Lepp, the district court found that, pursuant to O Centro,
neither the dangerousness of marijuana nor the government's

interest in the uniform application of its criminal laws constituted a compelling interest for purposes of RFRA.  2008 WL 3843283, at *8-10.  The district court then found that there was a compelling governmental interest in preventing Lepp from diverting the large quantities of marijuana that he cultivated and possessed, which was purportedly for Rastafarians, to non-adherents.  Lepp had almost 25,000 plants growing on several acres, and he had signs on the perimeter of his property stating that he was growing marijuana.  Further, the plants were in plain view from the highway and were readily accessibly by walking on to the property.  In fact, Lepp was charged with selling one pound of marijuana to an undercover agent.  Id. at *11.  The district court stated "the evidence here demonstrates that it is far more likely than not that the marijuana seized could have been diverted to non-adherents" and "a compelling governmental interest in regulating against *this* defendant has been shown." Id. (emphasis in original).

This Court acknowledges that the threat of diversion to non-adherents in the instant case is not of the same nature and extent as the of threat of diversion in Lepp.  In the instant case, the Government does not contend that there was a threat of diversion from the THC Ministry's marijuana cultivation operation at the farm of co-defendants Susanne Lenore Friend and Timothy M. Mann.  The Government contends that there was a

11

significant threat of diversion to non-adherents from the
Ministry's office itself.  In order to evaluate the alleged
threat of diversion, this Court must examine the evidence in the
record regarding the Ministry's operations and the manner in
which the Ministry distributed marijuana.

A.    **Ministry Operations**

Jessica Walsh, a former employee of the THC Ministry,
testified that Christie paid her either with cash or with
marijuana for her personal use.  [Walsh Decl. at ¶ 3.]  After she
applied for employment at the Ministry, Christie invited her to
attend an orientation session to become a member of the Ministry.
Ms. Walsh attended an orientation with approximately three other
people.  At the orientation, Christie told them that there was a
voluntary fifty-dollar "donation" to become a member.  Christie
also offered marijuana at the orientation, but he made it clear
that the "donation" for the marijuana was mandatory.  Although
Ms. Walsh did not become a member at the orientation, she did
become a member after Christie told her that she was hired.  [Id.
at ¶ 4.]  Victoria Fiore, another former Ministry employee, also
testified that the membership donation was optional.  She became
a member at an orientation even though she could only give twenty
dollars for her membership.  Fiore also observed that the
donation for the marijuana offered at the orientation was
mandatory.  [Fiore Decl. at ¶ 3.]  Fiore testified that, at the

12

orientation, Christie explained that it is legal for a person to use Cannabis as a sacrament as long he or she is sincere in using it for religious purposes.  [8/27/13 Hrg. Trans. at 69.]

According to Walsh, when she first started working with the THC Ministry, Christie would meet with people privately in his office to distribute the "sacrament," which was the Ministry's code word for marijuana.  In the spring of 2009, however, Christie and St. Cyr started the "express" service to expedite the distribution of the sacrament.[11]  The express service became the Ministry's primary method of distributing marijuana.  [Walsh Decl. at ¶ 7.]  Walsh believed that Christie agreed to implement the express service because he wanted to help more people receive the sacrament.  [8/27/13 Hrg. Trans. at 42.]

Under the express service, each person presented his or her THC Ministry identification card ("Ministry ID") or medical marijuana card to Walsh (or whichever Ministry employee was handling the express desk that day), and she would inform the person of the donation amounts for the sacrament available that day.  The person told her how much he or she wanted and tendered full amount of the requested donation in cash.  [Walsh Decl. at ¶ 11.A.]  Walsh wrote down the requested quantity and put the

---

[11] On cross-examination at the evidentiary hearing, Walsh testified that Heather Duffy had a role in setting up the express service and that Duffy was the one who recommended it.  [8/27/13 Hrg. Trans. at 40-41.]

order with the donation and the person's Ministry ID in an
envelope, which she took to Christie's office.  Christie would
check the order, count the money, and give Walsh the order from a
supply of pre-packaged amounts.  Walsh then gave the amount to
the person and returned his or her Ministry ID card.  [Id. at
¶ 11.B.]  The vast majority of the people who obtained sacrament
left immediately thereafter, without seeing Christie or St.
Cyr.[12]  [Id. at ¶¶ 11.B., 11.E.]  To make the process even more
efficient, Walsh would accumulate multiple orders before taking
the envelopes to Christie's office.  [Id. at ¶ 11.C.]  Fiore
sometimes manned the express desk, and her description of the
express service was consistent with Walsh's.  [Fiore Decl. at
¶¶ 6-9.]  In addition, Fiore testified that sometimes there would
be a small sample of the sacrament available at the express desk
for customers to see.  [Id. at ¶ 7.]

    Walsh testified that, every morning on the days that
the Ministry's office was open for the distribution of sacrament,
there was an employee meeting during which Christie told them
what types of sacrament were available that day and what the
donation amounts were.  Around mid-2009, when Christie was at
home recovering from a broken ankle, St. Cyr led those

_____

    [12] According to Fiore, when Christie would meet with members
individually, he sometimes spent up to an hour with the member.
Thus, "the whole purpose of express was to avoid having to meet
with Roger and to get people in and out of the Ministry in the
shortest period of time."  [Fiore Decl. at ¶ 9.]

meetings.[13]   [Id. at ¶ 8.]   Walsh estimated that this period was more than one month, but less than three months.   [8/27/13 Hrg. Trans. at 37.]

> The typical 'donation' prices for the sacrament which Roger Christie or [St. Cyr] quoted at these meetings were: $10 for .7 - .8 grams; $20 for 1.5 grams; $50 for 3.5 grams (about 1/8 ounce); $100 for 7 grams (about a 1/4 ounce); $200 for 14 grams (about ½ ounce); and anywhere between $350 and $400 for 28 grams (about an ounce).

[Walsh Decl. at ¶ 8.]   The donation amount varied depending on the quality and strain of the marijuana.   [Id.]   Although the amounts were called "donations," Walsh and Fiore understood them to be prices for the sale of marijuana.   Christie and St. Cyr instructed the employees not to write the amounts on paper and to memorize them instead.   Employees were not to give sacrament to a person who could not pay the quoted amount unless Christie or St. Cyr gave explicit authorization to do so.   [Id. at ¶ 9; Fiore Decl. at ¶¶ 6, 11.]   According to Walsh, members frequently requested sacrament for less than the quoted donation amount. Christie sometimes accepted this request, but sometimes he did not.   [8/27/13 Hrg. Trans. at 51-52.]   The majority of exchanges in the express service were for twenty dollars to fifty dollars. [Id. at 22, 71.]   Walsh testified that, in her experience,

---

[13] Walsh described Christie's and St. Cyr's relationship at the Ministry as "close to like a manager and assistant manager, so [St. Cyr] had a say. . . .  [Christie] would listen to her opinion on things, and then [Christie] would generally say yes or nay to whatever the topic was."  [8/27/13 Hrg. Trans. at 38.]

Christie was not motivated by money.  [Id. at 34.]  Christie,
however, would refer to days that the Ministry took in a thousand
dollars in donations for sacrament as "a grand day[.]"  [Id. at
58.]  Walsh testified that there were only a few times that
Christie told her it was "a grand day."  [Id. at 61.]

     In addition to the sacrament, the Ministry also offered
other marijuana products, including edibles, tinctures, and
anointing oil, as well as live plants.  Each of the items had a
"donation" price.  [Walsh Decl. at ¶ 15.]  The Ministry gave out
"aloha bags" of sacrament free-of-charge, but "the grade of
marijuana in such aloha bags was very low, being what is called
'shake', the least desirable parts of the marijuana plants,
consisting of stems and leaves and other clippings left over
after trimming out the buds."  [Id. at ¶ 16.]  On rare occasions
when he could not obtain any shake, Christie would use lower
grades of marijuana buds for the aloha bags.  [Id.]

     Christie and St. Cyr did instruct Ministry employees
that only Ministry members or medical marijuana cardholders could
obtain sacrament.  Walsh estimated that eighty-five percent to
ninety percent of the people who obtained sacrament from the THC
Ministry were Ministry members.  The others were medical
marijuana cardholders.  [Id. at ¶ 10.]  Walsh testified that,
when a person came to the express desk to obtain sacrament, all
the person was required to do was show a Ministry ID card.  If

16

the signature on the card was illegible, Walsh was not required to ask for any further identification, nor was she required to read the card in the first instance.  Walsh testified that she was not required to check Ministry membership records to confirm that the card-holder was actually a member.  [8/27/13 Hrg. Trans. at 11-12.]  Walsh also testified that she acted as the Ministry's doorman a few times during her employment, and she was not instructed to check anything other than the Ministry ID card. She could not, however, state what the other employees did when they served as the doorman.  [Id. at 13-14.]

A person could become a member of the THC Ministry in person by paying a fifty-dollar suggested donation or by applying through the mail and ordering a "Sanctuary Kit" for a suggested donation of $250.  [Walsh Decl. at ¶ 10.]  Fiore estimated that, while she was working at the Ministry, she mailed out approximately eight Sanctuary Kits per week to persons outside of the Island of Hawai`i.  [Fiore Decl. at ¶ 13.]  Walsh also prepared Sanctuary Kits during her employment with the THC Ministry.  She testified that:

> A Sanctuary Kit was a Postal Service mailing box
> which contained a number of items, for example:
>
>     -Ministry paperwork with court documents and
>     historical and religious references;
>
>     -A blank Ministry membership ID card to be
>     filled-out by the recipient . . . ;
>
>     -A bottle of holy anointing oil, which

17

> contained marijuana;
>
> -A Sanctuary sign;
>
> -Numerous plant tags and bag tags for labeling the customer's growing marijuana plants and bags of sacrament.
>
> In addition, every Sanctuary Kit also contained a "certificate of good standing" which was prepared in the customer's name and signed by Roger Christie.

[Walsh Decl. at ¶ 12.[14]]  At the evidentiary hearing, Walsh clarified that each Sanctuary Kit had two blank Ministry ID cards.  The person receiving the Sanctuary Kit was to sign his or her name on the signature line on the front of the card. [8/27/13 Hrg. Trans. at 8-9.]  Fiore testified that it was her understanding that Sanctuary Kits were primarily sent to people who were not regular participants in the express system.  [Id. at 72.]  Walsh, however, also testified that, when people applied in person to become members of the Ministry, they were given blank cards to fill out.  [Id. at 10.]

Insofar as, 1) the THC Ministry distributed two blank membership cards to each person applying for membership, 2) the Ministry did not confirm that persons who came to the express service were who their Ministry ID card identified them as, and 3) the Ministry did not confirm that the person named on the Ministry ID card was actually a member of THC Ministry, there was

---

[14] Pictures of a typical Sanctuary Kit were admitted into evidence at the evidentiary hearing as Exhibits SK01 to SK11.

clear potential for diversion of large quantities of marijuana to non-adherents.

**B.    Enforcement of Ministry Rules**

Defendants argue that the Government does not have a compelling interest in using this prosecution to prevent the alleged diversion of marijuana to non-adherents because the Ministry restricted the use and distribution of the sacrament to its members.  According to Christie, the THC Ministry has 2,000 to 3,000 members on the Island of Hawai`i alone, and the THC Ministry would provide sacrament to 200 to 400 members per month. [Motion in Limine, Decl. of Roger Christie ("Christie Decl.") at ¶ 46.]  Christie only distributed Cannabis to persons on the Island of Hawai`i, and he never disbursed more than one ounce at a time, except one time to an undercover DEA agent who had become a THC Ministry minister.  The agent requested more than one ounce because he said he lived on O`ahu and did not want to return to Hilo.  [Id. at ¶¶ 47-78.]  Walsh testified that, although it was "pretty rare," there were a few times when people from out-of-state would participate in the express service.  [8/27/13 Hrg. Trans. at 29.]  She acknowledged that the majority of participants in the express service were from Hilo.  [Id.]

The THC Ministry's website states: "We provide a legitimate religious 'defense to prosecution' for sincere practitioners over 21 years old."  [Excerpts from THC Ministry's

Website, filed 6/3/13 (dkt. no. 613) ("Website Excerpts"), at 2
(emphases in original).[15]  Christie also states that, in order
to become a member of the THC Ministry, a person "must be over 21
years of age and must affirm that he/she will use Cannabis
sincerely as part of his/her religious practice and method of
worship."  [Christie Decl. at ¶¶ 37.]  The Ministry's website
also stated:

> Your successful religious defense to prosecution
> is based upon five qualities:
>
> 1.    Sincerity.
>
> 2.    Legitimacy.
>
> 3.    A mandate to grow and use Cannabis.
>
> 4.    Sacrament must be used in private,
>       preferably at home or at church.
>
> 5.    Sale of Sacrament is not permitted.

[Website Excerpts at 4-5.]

Christie states that only Ministry members were allowed
in the THC Ministry's "Sanctuary," which was located in the Moses
Building in Hilo, Hawai`i.  [Christie Decl. at ¶¶ 29-30.]  A
doorman checked members' Ministry ID cards, or ensured that he or
she was a medical marijuana patient, prior to entry, and "[p]rior
to entering the Sanctuary a member [was required to] wash his/her
hands with hemp soap to ensure cleanliness. . . ."  [Id. at

---

[15] This Court's citations to the Website Excerpts refer to
the page numbers as they appear in this district court's cm/ecf
system.

20

¶¶ 30, 47.] This was a symbolic practice that Christie required to ensure the sincerity of members who wanted to obtain sacrament. He also required those members to use good manners and show respect. [8/27/13 Hrg. Trans. at 21-22, 70-71.]

During the Ministry's regular Sunday services, Christie typically started with a welcome period during which everyone had to introduce himself or herself and state why he or she was there. According to Christie, part of the purpose for this "was to weed-out . . . any visitors or members who seemed insincere." [Christie Decl. at ¶ 42.] Christie states: "Members of the general public could not access the THC Ministry's supply of Cannabis. I monitored who received Cannabis and blessed it before it went to members and medical marijuana patients." [Id. at ¶ 50.]

There is no evidence of how Christie determined whether persons at the Sunday services were sincere, nor is there evidence of how Christie dealt with an attendee who Christie found to be insincere. Even assuming, however, that Christie effectively prevented the distribution of marijuana to non-adherents at the THC Ministry's Sunday services, the primary method through which the Ministry distributed marijuana was the express service. In light of the manner in which the Ministry distributed the ID cards and conducted only a cursory review of the cards when "members" came to the express service to obtain

21

sacrament, there was a significant and foreseeable potential that non-adherents would misuse the Ministry ID cards to obtain marijuana.

Walsh testified that she did not know of any specific instance in which a person used someone else's Ministry ID card to obtain marijuana. [8/27/13 Hrg. Trans. at 21.] She also stated that she never checked members' drivers' licenses to confirm their identities, and she had no way of knowing if a person was using someone else's card. Walsh suspected at times that there were members who were not who they said they were, but this did not prevent them from obtaining sacrament. [Id. at 52, 57-58.]

Defendants have also emphasized that the Ministry's website clearly states that members must be sincere in their use of Cannabis as a religious sacrament. At the evidentiary hearing, Walsh acknowledged that Christie would explain to members that the sacrament was for religious use. [8/27/13 Hrg. Trans. at 26.] Fiore also admitted that she has heard Christie say to herself and to others that Cannabis as a religious sacrament should be used at home, at church, or in nature. [Id. at 69.] The evidence as a whole, however, establishes that: the express service was the primary means through which the THC Ministry distributed Cannabis; the express service was created to eliminate the need for Christie, or St. Cyr, to meet with each

member who wanted to obtain Cannabis.; and the vast majority of
persons who went through the express service did not speak with
Christie or St. Cyr when they obtained Cannabis.  Thus, when
those people obtained Cannabis, they did not hear Christie's
explanation that the Cannabis was to be used only for religious
purposes, preferably at home, at church, or in nature.

The evidence as a whole establishes that employees of
the THC Ministry never advised people who came through the
express service that there were restrictions on what "members"
could do with the sacrament.  For example, they never told
customers that the sacrament was only for religious purposes or
that "members" could only use the sacrament on Ministry premises
or that "members" were prohibited from distributing the sacrament
to non-members.  [Walsh Decl. at ¶ 11.D; Fiore Decl. at ¶ 10.]
Walsh, Fiore, and the other Ministry employees were aware of the
Ministry's parameters regarding the use of Cannabis, and the
parameters were available to members and to the public through
Ministry literature and the website.  There is, however, no
evidence that Ministry employees confirmed that people who went
through the express service were aware of these parameters and
that those people agreed to abide by them.  As it was used, the
Ministry ID card system was not an effective means of ensuring
that persons who came to the express service knew of and agreed
to the Ministry's parameters for the use of Cannabis.  Although

the Ministry required persons coming through the express service to wash their hands with hemp soap and to be polite and respectful, there is no indication that, by doing so, these persons acknowledged and agreed to the Ministry's parameters for the use of Cannabis.

Finally, this Court notes that Defendants have presented evidence suggesting that there is increasing recognition in the medical community of the benefits of marijuana and that there is increasing political sentiment that the federal government's war on drugs, and criminal justice system in general, should be focused on crimes other than marijuana-related crimes.  However, the decision of whether or not the federal government will adopt such opinions is not for this Court to make.  Unless and until Congress amends the CSA's restrictions on marijuana, the Government has an interest in enforcing the provisions of the CSA which Defendants are accused of violating.

Having reviewed all of the evidence presented in connection with the Motion in Limine, this Court finds that it is far more likely than not that a significant portion of the marijuana that Defendants distributed could have been diverted to non-adherents.  This Court therefore finds that the Government has established a compelling interest in enforcing the CSA against Defendants.  This Court now turns to the issue of whether the prosecution of this case is the least restrictive means

24

necessary to further the Government's compelling interest.

## II. **Least Restrictive Means**

In determining whether the governmental restriction of a defendant's religious exercise is the least restrictive means necessary to further the compelling governmental interest, "'[t]he pivotal issue . . . is whether [the drug's] usage by [the defendant] and other members of his church can be accommodated without undue interference with the government's interest in controlling the drug.'" Lepp, 2008 WL 3843283, at *12 (quoting Olsen v. Drug Enforcement Agency, 878 F.2d 1458, 1462 (D.C. Cir. 1989)). Further, in reviewing the harm that would result if an exception were granted to the party asserting the RFRA, a court "must analyze the effect of a religious exemption as if it would apply to" that person and all other adherents of his religion. Id. (citing United States v. Adeyemo, No. CR 03-40200 MJJ, 2008 WL 928546, at *11 n.11 (N.D. Cal. April 4, 2008) (Jenkins, J.); O Centro, 546 U.S. at 430-31). The district court in Lepp stated:

> Olsen is persuasive here because of its discussion regarding the scale of marijuana usage in the United States. Specifically, it states:
>
>> [T]he actual abuse and availability of marijuana in the United States is many times more pervasive . . . than that of peyote . . . . The amount of peyote seized and analyzed by the DEA between 1980 and 1987 was 19.4 pounds. The amount of marijuana seized and analyzed by the DEA between 1980 and 1987 was 15,302,468.7 pounds. This overwhelming

25

> difference explains why an accommodation can
> be made for a religious organization which
> uses peyote in circumscribed ceremonies, and
> not for a religion which espouses continual
> use of marijuana.
>
> [Olsen, 878 F.2d] at 1463.  That court then rested
> its decision in part "on the immensity of the
> marijuana control problem in the United States."
> Id. at 1464.  Similarly, here, in light of
> evidence of actual diversion, the court is
> convinced that the least restrictive means to
> circumvent the diversion of mass quantities of
> marijuana to non-adherents of Rastafarianism is a
> blanket rule criminalizing large quantities of
> marijuana. . . .

Id. at *12-13 (some alterations in Lepp).  Similarly, the

district court in Lepp distinguished O Centro, which only

involved three drums of *hoasca*, as opposed to the thousands of

marijuana plants at issue in Lepp.  Thus, the district court

emphasized that its decision was consistent with O Centro because

it restricted Rastafarians' distribution of marijuana and did not

merely implicate their possession of marijuana for personal use.

Id. at *13 (discussing O Centro, 546 U.S. at 425, 439).

Lepp recognized that it was hypothetically possible for

a defendant to establish that large quantities of marijuana were

necessary to provide marijuana to a mega-church, but Lepp did not

prove that the size of his congregation required the quantities

of marijuana he was responsible for.  He claimed, without

evidentiary support, that his church had 2,500 parishioners who

were sharecroppers of the marijuana plants growing on his

property.  Even if he had proven this claim, the district court

would be required to examine: the sincerity of all 2,500 parishioners' faith; whether the tenets of their faith required ten plants per parishioner; and how Lepp and the other parishioners would restrict access to the marijuana to sincere adherents to their faith.  The district court was also concerned with the dual standard that it would be creating for ministers, as opposed to adherents, particularly where anyone could become ordained through Lepp's church.  Id. at *13 & n.4.

As in Lepp, Defendants were distributing large quantities of marijuana; the instant charges against Defendants do not merely implicate their possession of marijuana for personal use.  Further, although Defendants assert that there were 2,000 to 3,000 members of the THC Ministry on the Island of Hawai`i alone, Defendants did not present any evidence supporting this claim and, as noted supra, the THC Ministry had no means of ensuring that the people who presented Ministry ID cards in the express service to obtain marijuana were in fact members of Ministry.  Moreover, although Defendants themselves may have emphasized the requirement of sincerity in the use of marijuana as a religious sacrament, the majority of the persons who obtained marijuana from the THC Ministry did so through the express service, which did not require them to meet with either of Defendants.

27

Having reviewed all of the evidence presented in connection with the Motion in Limine, this Court finds that, if this Court were to recognize a RFRA exemption for Defendants' activities, it would unduly interfere with the Government's interest in controlling marijuana.  This Court therefore finds that the prosecution of Defendants in the instant case is the least restrictive means necessary to further the Government's compelling interest in enforcing the CSA against Defendants.

Insofar as this Court has found that the Government has established both that it has a compelling interest in enforcing the CSA against Defendants and that the prosecution of Defendants in the instant case is the least restrictive means necessary to further that interest, this Court CONCLUDES that Defendants are not entitled to present a RFRA defense at trial.

## CONCLUSION

On the basis of the foregoing, Defendants' Motion in Limine to Present Religious Freedom Restoration Act Defense, filed April 1, 2013, is HEREBY DENIED.

IT IS SO ORDERED.

28

DATED AT HONOLULU, HAWAII, December 30, 2013.



　　　　　　　　　　/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

USA V. ROGER CUSICK CHRISTIE, ET AL.; CR. NO. 10-00384(01) LEK;
ORDER DENYING DEFENDANTS' MOTION IN LIMINE TO PRESENT RELIGIOUS
FREEDOM RESTORATION ACT DEFENSE